Susan D. GOLAND and Patricia B. Skidmore, Appellants,

v.

CENTRAL INTELLIGENCE AGENCY et al.

No. 76–1800.

United States Court of Appeals, District of Columbia Circuit.

Argued 5 Oct., 1977.

Decided 23 May, 1978.

Rehearing Denied 28 March, 1979.

James H. Wallace, Jr., Washington, D. C., with whom Thomas C. Arthur and Mark H. Lynch, Washington, D. C., were on brief, Alan B. Morrison and Larry P. Ellsworth, Washington D. C., were on the motion to vacate and on the petition for rehearing, for appellants.

John F. Cordes, Atty., Dept. of Justice, Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Rex E. Lee, Asst. Atty. Gen., and Leonard Schaitman, Atty., Dept.

of Justice, Washington, D. C., were on brief, for appellees.

Thomas C. Martin, Dept. of Justice, Washington, D. C., entered an appearance for respondent.

Before BAZELON, TAMM and WILKEY, Circuit Judges.

Opinion for the Court filed by WILKEY, Circuit Judge.

## OUTLINE OF OPINION

I. FACTUAL BACKGROUND .......——
II. COURSE OF THE LITIGATION ...——
III. ANALYSIS ....................——
    A. The Hearing Transcript .......——
    B. The Hillenkoetter Statement ...——
    C. The Thoroughness of the CIA's Search for Responsive Documents ....................——
    D. The CIA's Definition of Agency "Records." .................——
    E. Attorneys' Fees .............——

WILKEY, Circuit Judge:

This case arises under the Freedom of Information Act (FOIA).[1] Plaintiffs Goland and Skidmore requested documents from the Central Intelligence Agency (CIA) relating to the legislative history of the Agency's organic statutes. In this suit they challenge the thoroughness of the CIA's search for responsive documents and the Agency's refusal to give them certain admittedly responsive material it does possess. The district court granted summary judgment in favor of the CIA. We affirm.

## I. FACTUAL BACKGROUND

The chronology of events must be elaborated in some detail. On 2 May 1975 Sara Holtz[2] filed an FOIA request with the CIA, seeking access to "all records concerning the legislative history" of the National Security Act of 1947,[3] the CIA Act of 1949,[4]

---

**1.** 5 U.S.C. § 552 (1976).

**2.** Holtz is not a party to this suit.

**3.** Act of 26 July 1947, ch. 343, § 102, 61 Stat. 497 (presently codified at 50 U.S.C. § 403 (1970)).

**4.** Act of 20 June 1949, ch. 227, §§ 1–10, 63 Stat. 208 (presently codified at 50 U.S.C. §§ 403a–403j (1970)).

and two bills introduced into Congress in 1948 providing for the administration of the Agency.[5] Specifically, Holtz requested access to "all reports of the Committees of the House and Senate and the Conference Committee which reported on the bills, and any hearings which may have been held on these bills or related to the subject of the authority, organization and administration" of the CIA.[6]

On 14 May the CIA responded to Holtz' letter, advising her that the documents she sought were congressional materials which would be available in the Library of Congress or the Government Printing Office. On 20 May 1975 Holtz wrote the Agency a second letter, stating her belief that hearings had been held on the bills she cited for which no transcripts were available in the Library of Congress, and requesting access to records of these hearings and to "any House, Senate or Conference Reports, besides those available in public libraries, that more fully explain the basis for the Committees' actions on these bills."[7]

The Agency responded on 23 June 1975, informing Holtz that a search of its records had revealed that it possessed one document relating to the legislative history of the CIA's organic statutes which was not publicly available, namely, a stenographic transcript of Hearings held before the House Committee on Expenditures in the Executive Departments on 27 June 1947 (hereinafter "Hearing Transcript"). The Agency stated, however, that the Hearing Transcript had been classified "Secret" by Congress and could be declassified only by that body; it suggested that Holtz request declassification and release of the document from the House of Representatives. There

were no further communications between Holtz and the CIA.

On 20 October 1975 plaintiffs Goland and Skidmore notified the CIA that they, like Holtz, were "investigating the authority, organization and administration" of the Agency, and requested "the documents requested by Ms. Holtz' letters."[8] Treating the CIA's failure to respond within ten days as a denial of their request,[9] plaintiffs on 20 November 1975 appealed that denial. On 26 November 1975 the CIA offered to send plaintiffs copies of five previously published hearings and reports, even though these documents were "generally available in the Library of Congress and various depository libraries."[10] With respect to the Hearing Transcript, however, the CIA reiterated its position that the Transcript was a "legislative document under the control of the House of Representatives" which was "classified 'Secret'" and to which FOIA did not apply.[11]

On 16 December 1975 Goland and Skidmore wrote the CIA to "elaborate on the basis of [their] appeal," asserting that the Agency's letter of 26 November failed to make clear whether the Transcript and the five published documents accounted for all the material they had requested.[12] In addition, plaintiffs expanded the scope of their request to embrace not only the reports and hearings they had sought originally, but also any "materials which may have been the basis for testimony at hearings" or "materials used by or submitted by the CIA or other Executive Branch sources which are included in [unpublished] reports" on the cited bills.[13] When the CIA failed to respond to this supplemental appeal within 20

---

**5.** S. 2688, 80th Cong., 2d Sess. (1948); H.R. 5871, 80th Cong., 2d Sess. (1948).

**6.** Joint Appendix (J.A.) 12.

**7.** J.A. 14–15.

**8.** J.A. 18.

**9.** Under 5 U.S.C. § 552(a)(6)(A)(i) (1976), an agency must respond to an FOIA request within ten working days; under § 552(a)(6)(C), a requester is deemed to have exhausted admin-

istrative remedies if the agency fails to comply with this time limit.

**10.** J.A. 22. These five documents (65 pages in all) were sent to plaintiffs on 12 January 1976. J.A. 78.

**11.** J.A. 22.

**12.** J.A. 23–24.

**13.** J.A. 24, 25.

working days,[14] plaintiffs filed suit on 28 January 1976.

On 10 March 1976 the CIA notified plaintiffs' counsel that it had identified two additional documents responsive to plaintiffs' FOIA request which "had not previously been located."[15] The first document was entitled "Statement of Lt. Gen. Hoyt S. Vandenberg, Director of Central Intelligence," delivered before the Senate Armed Services Committee on 29 April 1947. This document was released to plaintiffs in full. The second document was entitled "Statement of the Director of Central Intelligence [Hillenkoetter] Before the House Armed Services Committee [on] 8 April 1948" (hereinafter "Hillenkoetter Statement"). This document was released to plaintiffs with certain portions (about 20% of the total) deleted; the Agency explained that the deleted material was exempt from disclosure under FOIA.

## II.   COURSE OF THE LITIGATION

The complaint sought an injunction directing the CIA to make available for copying all "records requested in plaintiffs' . . . letter" of 20 October 1975,[16] a declaratory judgment holding the CIA's allegedly restrictive definition of "agency records"[17] invalid, and an award of attorneys' fees. On 10 March 1976 plaintiffs filed interrogatories, a request for production of documents, and a notice of deposition to the CIA. Rather than submit to discovery, the CIA on 5 April 1976 filed a motion for summary judgment based on affidavits. The Agency contended that the Hearing Transcript was not an "agency record" but rather a congressional document not subject to FOIA;[18] that both the Transcript and

the deleted portions of the Hillenkoetter Statement were properly withheld under FOIA Exemption 3, relating to matters "specifically exempted from disclosure by statute;"[19] that both the Transcript and the deleted portions of the Hillenkoetter Statement were properly withheld under FOIA Exemption 1, relating to matters "specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy;"[20] that the CIA's search had been complete and there existed no other responsive documents; and that plaintiffs lacked standing to challenge the CIA's definition of "agency records" inasmuch as the Agency had not relied on that definition in processing their FOIA request. Plaintiffs responded to the motion principally on the grounds that discovery was needed to resolve disputed issues of fact.

Judge Hart granted the CIA's motion for summary judgment on 26 May 1976.[21] He found that the Hearing Transcript was a congressional document outside the ambit of FOIA, that the deleted portions of the Hillenkoetter Statement were properly withheld under FOIA Exemption 1, and that no further discovery was justified since the CIA had "made a full search in good faith."[22] Judge Hart made no findings about plaintiffs' standing to challenge the CIA's definition of agency records or about their request for attorneys' fees. We consider these issues in turn.

## III.   ANALYSIS

### A.   *The Hearing Transcript.*

■ The FOIA requires that an agency make "agency records" available to the

---

**14.** *See* 5 U.S.C. § 552(a)(6)(A)(ii) & (C) (1976).

**15.** J.A. 129.

**16.** J.A. 9.

**17.** 32 C.F.R. § 1900.3(g) (1976). The definition has recently been amended. *See* 42 Fed.Reg. 24,049 (12 May 1977) (codified at 32 C.F.R. § 1900.3(g) (1977)).

**18.** Congress is not an "agency" under FOIA. *See* 5 U.S.C. § 551(1)(A) (1976).

**19.** 5 U.S.C. § 552(b)(3) (1976).

**20.** 5 U.S.C. § 552(b)(1) (1976). These documents were classified "Secret" under Executive Order No. 11652, 3 C.F.R. 678 (1971–75 Compilation).

**21.** Judge Hart's decision, rendered from the bench, is printed at J.A. 187–90.

**22.** J.A. 190.

public upon reasonable request.[23] The Act does not define "records" or "agency records."[24] Plaintiffs argue that since the CIA is an "agency" its possession of the Hearing Transcript, without more, renders that document an "agency record" subject to disclosure absent specific exemption.[25] The CIA argues that possession is not enough; it points out that "agency," as defined by the Administrative Procedure Act, "does not include (A) the Congress . . . ,"[26] and that the Hearing Transcript, regardless of whether it is a "record," is not an *agency* record" on the facts of this case.[27] The district court found that the Hearing Transcript was "released to the CIA for limited purposes as a reference document only" and that it "remain[ed] within the control of Congress;"[28] the court concluded that the Transcript was in consequence a "Congressional document,"[29] and not an "agency record" within the meaning of FOIA. We agree.

■ At the outset, we reject plaintiffs' argument that an agency's possession of a document *per se* dictates that document's status as an "agency record."[30] We base

23. 5 U.S.C. § 552(a)(3) & (4)(B) (1976).

24. *See* U. S. Dept. of Justice, Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act 23 (1967) [hereinafter Attorney General's FOIA Memorandum].

25. Brief of Appellants at 40; J.A. 24.

26. 5 U.S.C. § 551(1)(A) (1976).

27. The CIA also argues that if the Hearing Transcript were an agency record for purposes of § 552(a)(3), it would be exempt from disclosure under FOIA Exemptions 1 and 3. *See* p. —— of —— U.S.App.D.C., p. 344 of 607 F.2d *supra*. Since we hold that the Hearing Transcript is a Congressional document, we do not consider these arguments.

28. J.A. 189.

29. *Id.*

30. In support of this argument, plaintiffs cite 44 U.S.C.A. § 3301 (West Supp.1977), an earlier version of which is quoted in the Attorney General's FOIA Memorandum, *supra* note 24 at 23. Section 3301 defines "records" for purposes of the management, disposal, and archival preservation of Government documents by the Administrator of General Services; it states that "[a]s used in [chapter 33 of 44 U.S.C.], 'records' includes all . . . papers . . . made *or received by* an agency of the United States Government . . . appropriate for preservation by that agency . . . ." (emphasis added). This definition is hardly controlling here. In enacting legislation on management and disposal of Government records, Congress was concerned with preserving an "[a]ccurate and complete documentation of the policies and transactions of the Federal Government." 44 U.S.C.A. § 2902(1) (West Supp.1977). With this objective in mind, Congress might well regard the Hearing Transcript as a "record . . . appropriate for preservation" by the CIA, since the Transcript contains information regarding "basic elements of [the CIA's] intelligence methodology" and details of the CIA's "structure and disposition of functions." Affidavit of CIA Legislative Counsel George L. Cary, J.A. 80 [hereinafter "Cary Affidavit"]. The sole result of the Hearing Transcript's being deemed an "agency record" under § 3301 by virtue of its receipt by the CIA is that the Transcript could not thereafter be destroyed except in conformity with the procedure Congress prescribed—a result plainly harmonious with Congress' objectives. *See* 44 U.S.C. § 3314 (1970). Congress' objectives in the FOIA, of course, were rather different. In the interests of secrecy, Congress exempted itself from the Act's disclosure requirements; yet the result of the Hearing Transcript's being deemed an "agency record" under § 552(a)(3) by virtue of its receipt by the CIA is that the Transcript's release could be required, regardless of Congress' wishes, unless the CIA could prove a specific exemption. Given this difference in result, we doubt Congress would agree that an "agency record" under 44 U.S.C. § 3301 is an "agency record" under 5 U.S.C. § 552(a)(3). Indeed, the two titles define "agency" differently. *Compare* 5 U.S.C. § 551(1)(A) & (B) (1976) ("agency" excludes Congress and the federal courts) *with* 44 U.S. C.A. § 2901(13) (West Supp.1977), *cross-referring* to 40 U.S.C. § 472(b) (1970) ("agency" includes not only executive agencies, but also "any establishment in the legislative or judicial branch," with exceptions). Congress, in any event, has had ample opportunities to make the § 3301 definition of "records" applicable in § 552(a)(3) of FOIA, but has never done so. *Cf.* 44 U.S.C.A. § 2906(a)(3) (West Supp.1977) (stating that under certain circumstances "records" under § 3301 shall be deemed records for purposes of 5 U.S.C. § 552a). One recent commentator has stated that § 3301, although it contains the "only statutory definition of 'record,'" is "an inappropriate answer to the definitional issue." J. T. O'Reilly, Federal Information Disclosure, ¶ 5.03 n.1 (1977).

Plaintiffs point out that the § 3301 definition of records was quoted in the Attorney Gener-

our conclusion both on precedent and on policy. The precedent is the Tenth Circuit's opinion in *Cook v. Willingham*,[31] the only decision cited to us or discovered by our own research that is squarely on point. In *Cook*, a prisoner sought a copy of his presentence investigation report under FOIA. Although the document was physically in the possession of the warden of a United States penitentiary, the Tenth Circuit held the place of possession not controlling. Noting that FOIA "does not apply to 'the courts of the United States,'"[32] it concluded that the presentence report, "made for the use of the sentencing court," thereafter "remains in the exclusive control of that court despite any joint utility it may eventually serve."[33] In consequence, the judicial document was "not an agency report and [was] therefore not available to the public" under FOIA.[34] Since the FOIA's exemptions for Congress and the federal courts are *in pari materia*,[35] *Cook* is firm support for the conclusion that the Hearing Transcript, a congressional document, is not "an agency record" here.

This conclusion likewise finds firm support in policy. Congress has undoubted au-

thority to keep its records secret, authority rooted in the Constitution,[36] longstanding practice,[37] and current congressional rules.[38] Yet Congress exercises oversight authority over the various federal agencies, and thus has an undoubted interest in exchanging documents with those agencies to facilitate their proper functioning in accordance with Congress' originating intent.[39] If plaintiffs' argument were accepted, Congress would be forced either to surrender its constitutional prerogative of maintaining secrecy, or to suffer an impairment of its oversight role. We decline to confront Congress with this dilemma absent a more convincing showing of self-abnegating congressional intent. It may be assumed that plaintiffs could not easily win release of the Hearing Transcript from the House of Representatives; we will not permit them to do indirectly what they cannot do directly because of the fortuity of the Transcript's location.

■ For reasons both of precedent and policy, then, we believe that plaintiffs' litmus test must be rejected. An agency's possession of a document, standing alone, no more dictates that it is an "agency record" than the congressional origins of a

---

al's FOIA Memorandum *supra* note 24 at 23. We do not see how this helps plaintiffs' case. The Attorney General noted that the FOIA did not define "records," then quoted the only available statutory definition of the term for what it was worth. He would have been remiss in not doing so. Yet his citation of the definition does not give it any greater extrapolative force than it inherently possesses. The Attorney General surely did not focus on the words "or received by," which plaintiffs italicize and which are relevant to our case. Indeed, the Memorandum elsewhere suggests that an agency's possession of a document does not *per se* render the document an "agency record" which the possessing agency must release. *See* note 46 *infra*.

**31.** 400 F.2d 885 (10th Cir. 1968) (per curiam), *followed in United States v. Dingle*, 546 F.2d 1378, 1381 (10th Cir. 1976).

**32.** 400 F.2d at 885, *citing* 5 U.S.C. § 551(1)(B) (1976).

**33.** *Id.*

**34.** *Id.* at 886. *See United Broadcasting Co.*, 58 F.C.C.2d 1243, 1245 (1975) (FCC withheld probationary report because "probationary report, like a presentencing report, properly belongs to

the Court for which it was made, and is therefore not capable of release under FOIA," citing *Cook*).

**35.** *See* 5 U.S.C. § 551(1)(A) & (B) (1976).

**36.** U.S.Const. art. I, § 5: "Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy . . . ."

**37.** *See Nixon v. Sirica*, 159 U.S.App.D.C. 58, 130–31, 487 F.2d 700, 772–73 (1973) (Wilkey, J., dissenting).

**38.** *E. g.*, H.R. Rule XI(2)(k)(7), *reprinted in* H.R. Doc. No. 416, 93d Cong., 2 Sess. 427 (1975): "No evidence or testimony taken in executive session may be released or used in public sessions without the consent of the committee."

**39.** *See* Letter from Deputy Att'y Gen. Harold R. Tyler, Jr. to Hon. Bella S. Abzug, 19 Feb. 1976, *quoted in* J.A. 60 (Justice Dept. declined to release confidential House report lest "communications and consultations between coequal branches" of government be stifled).

document, standing alone, dictate that it is not. Whether a congressionally generated document has become an agency record, rather, depends on whether under all the facts of the case the document has passed from the control of Congress and become property subject to the free disposition of the agency with which the document resides.

The document at issue here is a photostatic reproduction of a stenographic transcript of a hearing held before the House Committee on Expenditures in the Executive Departments on 27 June 1947, entitled "H.R. 2319—Unification of the Armed Forces." The Committee was sitting in Executive Session. As the first order of business, the Chairman swore the stenographer and typist to secrecy.[40] The transcript contains discussions of basic elements of intelligence methodology, both of this country and of friendly foreign governments, as well as detailed discussions of the CIA's structure and disposition of functions.[41] When received by the CIA, the Transcript bore the typewritten marking "Secret" on its interior cover page; this marking appears to have been appended at the time the Transcript was made.[42] The typewrit-

ten mark "Secret" appears again on the first page of the text of the Transcript. The CIA retains a copy of the Transcript for internal reference purposes only, to be used in conjunction with legislation concerning the Agency and its operations.[43]

Given these facts, we conclude that the Hearing Transcript remains under the control of and continues to be the property of the House of Representatives. We base our conclusion both on the circumstances attending the document's generation and the conditions attached to its possession by the CIA. The facts that the Committee met in executive session[44] and that the Transcript was denominated "Secret" plainly evidence a Congressional intent to maintain Congressional control over the document's confidentiality.[45] The fact that the CIA retains the Transcript solely for internal reference purposes indicates that the document is in no meaningful sense the property of the CIA; the Agency is not free to dispose of the Transcript as it wills, but holds the document, as it were, as a "trustee" for Congress. Under these circumstances, the decision to make the transcript public should be made by the originating body, not by the recipient agency.[46]

40. Cary Affidavit, *supra* note 30, J.A. 80.

41. J.A. 80–81. Because the CIA methodology and disposition of functions described in the Transcript are still operable, and because disclosure of the information could damage U.S. relations with friendly foreign governments, the CIA itself separately classified portions of the Transcript "Secret" pursuant to Executive Order 11652. *See* note 20 *supra.* We do not consider whether this classification was proper. *See* note 27 *supra.*

42. Cary Affidavit, *supra* note 30, J.A. 80.

43. *Id.* at 79–80.

44. *Cf.* S.Rep.No.5, 81st Cong., 1st Sess. ("First Annual Report of the Investigations Subcomm. of the Comm. on Expenditures in the Executive Departments") 3 (1949): "Executive hearings were . . . utilized in cases involving national security and in other instances when it was determined that public disclosure might be detrimental to the public interest."

45. Plaintiffs point out that the predecessor of current House Rule XI(2)(k)(7), *supra* note 38, governing secrecy of testimony taken in execu-

tive session, was not enacted until 1955. Brief at 41. *See* H.R.Doc. No. 416, *supra* note 38 at 427. It is clear, however, that the Rule simply formalized longstanding practice. *Cf., e. g.,* S.Rep.No.5, *supra* note 44 at 3–4: "The subcommittee calls attention to the following rules of procedure which it adopted and which it has uniformly followed: . . . (5) All testimony taken in executive hearings shall be secret and will not be released or used in public hearings without the approval of a majority of the subcommittee." Even without the benefit of a general Rule, moreover, the transcript on its face manifests the indicia of Congress' intent to maintain secrecy. Since it is Congress' intent to maintain secrecy, and not Congress' conformance with the procedural niceties of classification, that makes the Transcript a "Congressional document," plaintiffs' arguments that discovery is required as to the identity of the classifier, the date on which the document was classified, etc., are irrelevant in reaching a decision here.

46. *Cf.* Attorney General's FOIA Memorandum, *supra* note 24 at 24:

Where a record is requested which is of concern to more than one agency, the request

■■ We hold, therefore, that the Hearing Transcript is not an "agency record" but a congressional document to which FOIA does not apply.[47] We reach this conclusion because we believe that on all the facts of the case Congress' intent to retain control of the document is clear. Other cases will arise where this intent is less plain. We leave those cases for another day.[48]

> should be referred to the agency whose interest in the record is paramount, and that agency should make the decision to disclose or withhold . . . . Where a record requested from an agency is the exclusive concern of another agency, the request should be referred to that other agency.

This rule was followed in *Friendly Broadcasting Co.*, 55 F.C.C.2d 775, 775–76 (1975) (where FBI Reports were loaned to FCC solely for internal reference purposes, Reports were "property of the Federal Bureau of Investigation" and FBI, "as the originator of the Reports, . . . is the agency to which the request should be addressed" under FOIA).

47. Plaintiffs argue that even if the Transcript as a whole is a "Congressional document," those portions originating with the CIA are producible as " 'reasonably segregable portion[s]' " with the "comments of members of Congress . . . deleted if necessary as 'Congressional materials.' " Brief at 42 & n.15, *citing* 5 U.S.C. § 552(b) (last sentence) (1976). This argument is frivolous. Congress met in executive session, and marked the Transcript "Secret," not only to protect its members' questions, but to protect its witnesses' answers. The cited provision from § 552(b), in any event, requires segregation and disclosure of non-exempt portions of *agency records*; since we hold that the Hearing Transcript is not an agency record, this provision has no application here.

48. In ascertaining whether a record in the possession of an agency is nonetheless a congressional document, a court will of course accord due weight to the factors that influence us in this case, including (1) Congress' clear intent to exempt congressional documents from disclosure under FOIA; (2) Congress' clear prerogative to prevent disclosure of its own confidential materials; and (3) the danger of inhibiting the legislative and judicial branches from making their records available to the executive branch.

The dissent argues that this test, and the conclusion it produces, prove too much: if the Hearing Transcript is a Congressional document, so also must the Hillenkoetter Statement be, a *reductio* our colleague evidently views as *ad absurdum*. *See* diss. op. at —— of 197

## B. *The Hillenkoetter Statement.*

The Hillenkoetter Statement is concededly an "agency record." Although the entire 113-page document was originally classified "Secret," the CIA has declassified approximately 80% of it and released those portions to plaintiffs. The Agency contends that the deleted portions are exempt from disclosure under FOIA Exemptions 1[49] and 3. The district court held this material ex-

U.S.App.D.C., at 361 of 607 F.2d. Since the CIA has never contended that the Hillenkoetter Statement is a Congressional document—since, indeed, the CIA has acted inconsistently with any such contention by declassifying and releasing 80% of the document—we see no need to consider this question. We might note, however, that between the Hillenkoetter Statement and the Hearing Transcript substantial differences lie. The former is a statement by a CIA official prepared by the CIA; we do not know the circumstances of its delivery in Congress, and it was classified "Secret," not by Congress, but by the CIA. The latter is a transcript of colloquy between Congressmen and CIA witnesses; it was created in Congress under circumstances manifesting a plain Congressional desire for secrecy, and it initially was labeled "Secret," not by the CIA, but by Congress. These distinctions are not, as our dissenting colleague says, a matter of paper and ink. The Transcript originated in Congress and remains a congressional document because it bears clear indicia of a congressional purpose to ensure secrecy; the Statement originated in the CIA and bears no indicia of any congressional purpose to ensure secrecy. It is these indicia of Congress' continuing *control* that are dispositive of a document's "congressional" status.

The dissent argues that " '[c]ontrol' in this sense goes to the question whether a document is *exempt* from disclosure—not to whether it is an 'agency record.' " Diss. op. at —— of 197 U.S.App.D.C., at 360 of 607 F.2d. This argument seems to mean that Congress can exercise "control" over secret documents that leave its possession only by enacting FOIA exemptions. We disagree. Congress has broad powers to keep its documents secret; when Congress transfers secret documents to an agency, for a limited purpose and on condition of secrecy, we see no reason to think it thereby waives its own prerogatives of confidentiality and resigns itself to the FOIA exemptions which bind the agency and not it.

49. The deleted portions of the Statement were classified "Secret" pursuant to Executive Order 11652 "in the interest of national defense or foreign policy." *See* p. —— of 197 U.S.App. D.C., p. 344 of 607 F.2d & note 20 *supra*.

empt, relying on Exemption 1. We agree, but base our holding instead on Exemption 3, without in any way impugning the correctness of Judge Hart's conclusion.[50]

As originally enacted, FOIA provided that the Act's disclosure requirements "[do] not apply to matters that are—. . . (3) specifically exempted from disclosure by statute."[51] Two statutes are relevant to an Exemption 3 claim by the CIA. A *proviso* to 50 U.S.C. § 403(d)(3) states that "the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure."[52] Section 403g of the same title provides that, "in order further to implement" this *proviso*, "the Agency shall be exempted from . . . the provisions of any . . . law which require the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the

Agency."[53] In *Weissman v. CIA*,[54] this Court squarely held that "both § 403(d)(3) and § 403g are precisely the type of statutes comprehended by exemption (b)(3)."[55] This conclusion derived incontrovertible support from legislative history[56] and was unanimously adopted by other courts.[57]

In 1976 Congress amended Exemption 3 in order to "eliminate the gap created in [FOIA]" by the Supreme Court's decision in *FAA Administrator v. Robertson*.[58] *Robertson* held that a statute giving an agency broad discretion to withhold information "in the interest of the public"[59] qualified as an Exemption 3 statute. Congress amended Exemption 3 to provide that information shall be deemed *specifically* exempted from disclosure by statute only if such statute "(A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding

50. Although "inquiries into the applicability of the two exemptions may tend to merge," *Phillippi v. CIA*, 178 U.S.App.D.C. 243, 250, 546 F.2d 1009, 1016 n.14 (1976), Exemption 3 may of course be invoked independently of Exemption 1. *See Weissman v. CIA*, 184 U.S.App. D.C. 117, 123, 565 F.2d 692, 698 (1977); *Marks v. CIA*, 426 F.Supp. 708, 710-11 n.5 (D.D.C. 1977), *appeal docketed*, No. 77-1225 (D.C. Cir. 3 March 1977); J. T. O'Reilly, *supra* note 30, at ¶ 13.07. Whether the deleted portions of the Hillenkoetter Statement were properly withheld is perhaps more clearly and briefly stated under Exemption 3 than under Exemption 1, hence we reach Judge Hart's conclusion by a different path.

51. 5 U.S.C. § 552(b)(3) (1970).

52. National Security Act of 1947, ch. 343, tit. I, § 102, 61 Stat. 497 (presently codified at 50 U.S.C. § 403(d)(3) (1970)).

53. CIA Act of 1949, ch. 227, § 7, 63 Stat. 211 (presently codified at 50 U.S.C. § 403g (1970)).

54. 184 U.S.App.D.C. 117, 565 F.2d 692 (1977).

55. *Id.* at 119, 565 F.2d at 694. *See Phillippi v. CIA*, 178 U.S.App.D.C. 243, 249 n. 19, 546 F.2d 1009, 1015 n.14 (1976).

56. S.Rep.No.93–854, 93d Cong., 2d Sess. 16 (1974) ("Intelligence Sources and Methods (50 U.S.C. § 403(d)(3) and (g)) . . . have been exempted from public inspection under section 552(b)(3) . . . ."); S.Rep.No.93–1200, 93d

Cong., 2d Sess. 12 (1974) (Conference Report) (same), U.S.Code Cong. & Admin.News 1974, p. 6267.

57. *E. g., Richardson v. Spahr*, 416 F.Supp. 752, 753 (W.D.Pa.), *aff'd*, 547 F.2d 1163 (3d Cir. 1976) (§§ 403(d)(3) & 403g are both Exemption 3 statutes); *Marks v. CIA*, 426 F.Supp. 708, 710–11 (D.D.C.1976), *appeal docketed*, No. 77– 1225 (D.C. Cir. 3 March 1977) (same); *Baker v. CIA*, 425 F.Supp. 633, 635 (D.D.C.1977), *appeal docketed*, No. 77–1228, 188 U.S.App.D.C. 401, 580 F.2d 664 (D.C. Cir. 3 March 1977) (same).

58. H.R.Rep.No.94–880, pt. 1, 94th Cong., 2d Sess. 23 (1976), U.S.Code Cong. & Admin.News 1976, p. 2183, *citing* 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975). The revision in Exemption 3 represented a conforming amendment to 5 U.S.C. § 552b(c)(3) (1976), part of the Government in the Sunshine Act, Pub.L. No. 94–409, § 3(a), 90 Stat. 1241 (1976).

59. *Robertson* involved § 1104 of the Federal Aviation Act of 1958, 49 U.S.C. § 1504 (1970), which provides in pertinent part: "Whenever [any person objects to public disclosure of information received by the FAA], the Board or Administrator shall order such information withheld from public disclosure when, in their judgment, a disclosure of such information would adversely affect the interests of such person and is not required in the interest of the public."

or refers to particular types of matters to be withheld."[60] There is nothing on the face of amended Exemption 3, or in its legislative history, to suggest that Congress in 1976 intended to upset the well-established Exemption 3 status of the CIA's protective statutes. Both § 403(d)(3) and § 403g "refer[ ] to particular types of matters to be withheld"—namely, information respecting intelligence sources and methods. Rep. Abzug, the amendment's primary sponsor in the House, explicitly stated on the floor that § 403g was one of the statutes intended to qualify under the new Exemption 3.[61] The only courts to consider the issue have held that the amendment left the Exemption 3 status of §§ 403(d)(3) and

403g unimpaired.[62] Scholarly commentators have reached the same conclusion.[63]

Having decided that § 403(d)(3) and § 403g remain qualifying statutes under amended Exemption 3, we must determine whether the deleted portions of the Hillenkoetter Statement fall within these statutes' protective compass. A court may be able to make such a determination on the basis of affidavits, without the need for discovery or *in camera* inspection.[64] Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within that statute's coverage.[65]

---

**60.** Act of 13 Sept. 1976, Pub.L.No.94–409, § 5(b), 90 Stat. 1247 (presently codified at 5 U.S.C. § 552(b)(3) (1976)). The amendment became effective 12 March 1977, 180 days after its enactment. *See* Pub.L. No. 94–409, § 6.

**61.** 122 Cong. Rec. H9260 (daily ed. 31 Aug. 1976):

> I have been asked whether 50 U.S.C. [§] 403g, a statute relating to CIA exemption from laws such as the Sunshine Act and the Freedom of Information Act, comes within the third exemption as recommended by the conference. I have examined section 403g and believe that it does come within the exemption.

The legislative history cites, by way of example, in addition to the statute involved in *Robertson, supra* note 59, several statutes that would *not* qualify under amended Exemption 3. *See* H.R.Rep.No.94–880, pt. 1, 94th Cong., 2d Sess. 23 (1976), *citing* 18 U.S.C. § 1905 (1970); S.Rep.No.94–1178, 94th Cong., 2d Sess. 14 (1976) (Conference Report), *citing* 42 U.S.C. § 1306 (Supp. V 1975). These statutes are of the oceanic variety involved in *Robertson* and are in marked contrast to the CIA statutes involved here. 42 U.S.C. § 1306 provides that no disclosure of any information obtained at any time by or from the Departments of HEW or Labor shall be made except as relevant regulations prescribe. 18 U.S.C. § 1905 prohibits "[d]isclosure of confidential information generally" by any officer or employee of the United States "in any manner or to any extent not authorized by law."

**62.** *Fonda v. CIA*, 434 F.Supp. 498, 503–04 & n.6 (D.D.C.1977), *appeal docketed*, No. 77–1989 (D.C. Cir. 4 Nov. 1977); *Hayden v. CIA*, No. 76–284, slip op. at 3–4 (D.D.C. 15 Apr. 1977), *appeal docketed*, No. 77–1894 (D.C. Cir. 30 Sept. 1977).

**63.** *See* J. T. O'Reilly, *supra* note 30, at ¶ 13.07 ("mandatory" nature of CIA statutes "bars disclosure under either the original or revised versions of exemption (b)(3)"); Note, *The Effect of the 1976 Amendment to Exemption Three of the Freedom of Information Act*, 76 Colum.L. Rev. 1029, 1044 n.91 (1976) (§ 403g qualifies under revised Exemption 3 because it specifies the "particular types of matters to be withheld").

**64.** Congress has instructed the courts to accord "substantial weight" to agency affidavits in national security cases. S.Rep.No.93–1200, 93d Cong., 2d Sess. 12 (1974) (Conference Report); 120 Cong.Rec. 36,870 (1974) (remarks of Sen. Muskie); *Weissman v. CIA*, 184 U.S.App.D.C. 117, 122 n.10, 565 F.2d 692, 697 n.10 (1977). A court has discretion to conduct *in camera* inspection under 5 U.S.C. § 552(a)(4)(B) (1976), but the legislative history makes clear that *in camera* inspection should be ordered only after an agency has been given "the opportunity to establish by means of testimony or detailed affidavits that the documents are clearly exempt from disclosure." S.Rep.No.93–1200, 93d Cong., 2d Sess. 9 (1974) (Conference Report), U.S.Code Cong. & Admin.News 1974, p. 6287. The description contained in the affidavits must be sufficiently detailed to show that the contested matter "logically falls into the category of the exemption indicated." *Weissman*, 184 U.S.App.D.C. at 122, 565 F.2d at 697.

**65.** *See* EPA v. Mink, 410 U.S. 73, 95 n.*, 93 S.Ct. 827, 840, 35 L.Ed.2d 119 (1973) (Stewart, J., concurring) (under Exemption 3 "the only 'matter' to be determined in a district court's *de novo* inquiry is the factual existence of [a relevant] statute, regardless of how unwise, self-protective, or inadvertent the enactment might be"); J. T. O'Reilly, *supra* note 30, at ¶ 13.07.

In this case, the issue for decision is whether the CIA has shown by affidavit that release of the Hillenkoetter Statement in its entirety would reveal "intelligence sources and methods," *e. g.*, by revealing the "organization" or "functions" of CIA personnel. According to an affidavit submitted by CIA Legislative Counsel George L. Cary, the deleted portions of the Hillenkoetter Statement contain detailed descriptions of (1) "intelligence collection and operational devices . . . still utilized"; (2) "methods of procurement and supply . . . unique to the Intelligence Community" which "are currently utilized"; (3) "basic concepts of intelligence methodology" of which "the essential elements remain viable"; (4) "specific clandestine intelligence operations," including the "names [of] the foreign countries involved"; and (5) "certain intelligence methodologies of a friendly foreign government." This affidavit has not been challenged. It demonstrates, in nonconclusory and detailed fashion,[66] that the deleted material describes "intelligence . . . methods," including the "functions" and "organization" of CIA personnel.[67] We hold, therefore, that the deleted portions of the Hillenkoetter Statement were properly withheld under FOIA Exemption 3.

The dissent would deny summary judgment on the Exemption 3 status of the Hillenkoetter Statement because the CIA did not furnish a *Vaughn v. Rosen* index of that document.[68] This argument exalts form over substance. *Vaughn* involved a request for numerous documents running to "many hundreds of pages," and the Government made a blanket claim that "the documents, as a whole, [were] exempt under three distinct exemptions."[69] We found it "preposterous to contend that all of the information [was] equally exempt under all of the alleged exemptions," and found "an adequate indexing system" necessary owing to our "inability to determine which exemptions appl[ied] to what portions of the information."[70] The present case involves 23 pages of deletions from one document. The CIA's affidavit lists the deletions; provides a "relatively detailed analysis"[71] of the material deleted; makes clear which exemptions are claimed for the deletions (Exemptions 1 & 3); and explains why the deleted material fits within the exemptions claimed (*i. e.*, how the deletions relate to "national security" and "intelligence sources and

---

In *Vaughn v. Rosen*, 157 U.S.App.D.C. 340, 484 F.2d 820 (1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), we noted the need of techniques to test for the presence in a withheld document of segregable, nonexempt matter, lest an agency be able to "sweep[ ] disclosable material under a blanket allegation of exemption." *Id.*, at 347 n.21, 484 F.2d at 827 n.21. In this case, the need for discovery or *in camera* inspection to test for the presence of segregable, non-exempt material is considerably diminished: the CIA's claims of exemption are by no means "blanket" or "sweeping," and the Agency has already segregated and released 80% of the Hillenkoetter Statement to plaintiffs.

**66.** *See Vaughn v. Rosen*, 157 U.S.App.D.C. 340, 346, 484 F.2d 820, 826 (1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).

**67.** Section 403g does not of course license the Agency "to refuse to provide any information at all about anything it does." *Phillippi v. CIA*, 178 U.S.App.D.C. 243, 249 n.14, 546 F.2d 1009, 1015 n.14 (1976). In this case, disclosure of the "personnel" material at issue would lead to disclosure of intelligence sources and methods. *But see Baker v. CIA*, 425 F.Supp. 633, 635–36

(D.D.C.1977), *appeal pending*, No. 77–1228 (D.C. Cir. 1978) (§ 403g personnel matter exempt under Exemption 3 even absent proof that disclosure would in fact compromise intelligence sources and methods).

**68.** *See* diss. op. at —— —— & —— —— of 197 U.S.App.D.C., at 356–358 & 364–365 of 607 F.2d, *citing* 157 U.S.App.D.C. 340, 346–48, 484 F.2d 820, 826–28 (1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).

**69.** *See* 157 U.S.App.D.C. at 345, 347, 484 F.2d at 825, 827.

**70.** *Id.* at 345–348, 347 n.22, 484 F.2d at 827–28, 827 n.22.

**71.** *Id.* at 346, 484 F.2d at 826. *See Maroscia v. Levi*, 569 F.2d 1000, 1003 (7th Cir. 1977) (per curiam) (upholding summary judgment on Exemption 1 status of CIA document, without *in camera* inspection, on basis of affidavit describing document "in some detail, indicating the circumstances and the sensitivity of the information," and explaining "[t]he potential harm resulting from disclosure of [the] document").

methods"). The CIA's justifications, we think, could not have been much more detailed without "compromis[ing] the secret nature of the information." [72] Although the Agency did not tender its analysis in the form of an "index," it satisfied the "detailed justification," "specificity," and "separation" requirements whose satisfaction the *Vaughn* index was meant to ensure. Although we do not retreat in the least from our belief that an index is of great assistance to requesters and courts in appropriate cases, common sense suggests that an index was unnecessary for the 23 pages that were so specifically described and justified here.

C. *The Thoroughness of the CIA's Search for Responsive Documents*

The CIA asserts that exhaustive searches of its files have succeeded in locating eight, and only eight, documents that are responsive to plaintiffs' FOIA request.[73] Plaintiffs contend that discovery is needed to test whether the CIA's search was complete. The district court awarded summary judgment in favor of the CIA, finding that "the CIA ha[d] made a full search in good faith and that no further discovery [was] justified." [74] We agree.

■ In order to prevail on an FOIA motion for summary judgment, "the de-

fending agency must prove that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements." [75] In determining whether an agency has met this burden of proof, the trial judge may rely on affidavits. Congress has instructed the courts to accord "substantial weight" to agency affidavits in national security cases,[76] and these affidavits are equally trustworthy when they aver that all documents have been produced or are unidentifiable as when they aver that identified documents are exempt. The agency's affidavits, naturally, must be "relatively detailed" and nonconclusory [77] and must be submitted in good faith. But if these requirements are met, the district judge has discretion to forgo discovery and award summary judgment on the basis of affidavits.[78]

In support of its motion for summary judgment, the CIA submitted affidavits executed by Gene F. Wilson, the Agency's Information and Privacy Coordinator. Wilson stated that in response to plaintiffs' initial request for "legislative history" he "caused a search to be made for all printed hearings, transcripts of hearings, [and] printed reports issued by Committees of the House, Committees of the Senate or Con-

---

72. *Vaughn v. Rosen*, 157 U.S.App.D.C. at 346–47, 484 F.2d at 826–27.

73. These documents are the five published hearings (released in full), the Vandenberg Statement (released in full), the Hillenkoetter Statement (withheld in part), and the Hearing Transcript (withheld in full). *See* pp. —— —— of 197 U.S.App.D.C., pp. 343–344 of 607 F.2d *supra*.

74. J.A. 190.

75. *National Cable Television Ass'n, Inc. v. FCC*, 156 U.S.App.D.C. 91, 94, 479 F.2d 183, 186 (1973).

76. S.Rep.No.93–1200, 93d Cong., 2d Sess. 12 (1974) (Conference Report); 120 Cong.Rec. 36,-870 (1974) (remarks of Sen. Muskie). *See EPA v. Mink*, 410 U.S. 73, 93, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973).

77. *Vaughn v. Rosen*, 157 U.S.App.D.C. 340, 346, 484 F.2d 820, 826 (1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).

78. *See Nolen v. Rumsfeld*, 535 F.2d 890, 891–92 (5th Cir. 1976) (granting summary judgment upon agency's representations "in candor and in good faith" that all responsive documents were made available to plaintiff); *Association of Nat'l Advertisers, Inc. v. FTC*, 38 Ad.L.2d 643, 644 (D.D.C. 1 April 1976) (where record indicates that agency search was "reasonably thorough," discovery may be limited by court; to justify discovery where FTC "has already stated under oath that the search was Commission-wide and complete, . . . [p]laintiff must demonstrate some substantial discrepancy between the defendants' actions and words . . . ."); *Exxon Corp. v. FTC*, 384 F.Supp. 755, 759–60 (D.D.C.1974), *remanded*, 174 U.S.App.D.C. 77, 527 F.2d 1386 (1976), *dismissed*, No. 73–1928 (D.D.C. 28 Feb. 1977) (limiting discovery where affidavits demonstrated adequacy of search).

ference Committees." [79] This search produced five published reports and the Hearing Transcript. Subsequently, plaintiffs expanded their request to include all documents "which may have been used to prepare for Congressional testimony." [80] Wilson then conducted a "further exhaustive search" for "copies of prepared testimony or statements presented in response to congressional consideration of the legislation" cited by plaintiffs.[81] In this search, the CIA "interpreted [plaintiffs'] request broadly enough to ensure that [it] would locate all documents within the scope of the request," and "searched and reviewed all files which might contain [responsive] documents." [82] This search produced the Vandenberg and Hillenkoetter Statements, but "failed to locate any additional records which could be considered responsive to plaintiffs' request." [83] Since the CIA has no indices or compendiums identifying records as "preparatory documents for congressional testimony," any additional records of this description, if they exist, could be found only by "a page-by-page search" through the "84,000 cubic feet of documents in the [CIA] Records Center." [84] Even if such a page-by-page search were undertaken, it would be "impossible to determine which documents, if any, were in fact used to prepare for congressional testimony on the legislation cited by plaintiffs." [85]

We think that Wilson's sworn affidavits on their face are plainly adequate to demonstrate the thoroughness of the CIA's search for responsive documents. The affidavits give detailed descriptions of the searches undertaken, and a detailed explanation of why further searches would be unreasonably burdensome. Plaintiffs argue, however, that even if Wilson's affidavits are otherwise sufficient to support summary judgment in favor of the CIA, discovery is required here because there is reason to doubt the Agency's good faith.

▪ First, plaintiffs note that hearings occurred on the CIA's enabling statutes for which no published transcripts exist, and argue that unpublished transcripts of these hearings, as well as CIA back-up documents prepared for use at these hearings, "*must exist.*" [86] Although appeals to common sense are not altogether to be condemned, plaintiffs' argument is unpersuasive here. Even if we assume that the documents plaintiffs posit were *created*, there is no reason to believe that the documents, thirty years later, still exist, or, if they exist, that they are in the possession of the CIA. Moreover, even if the documents do exist and the CIA does have them, the Agency's good faith would not be impugned unless there were some reason to believe that the supposed documents could be located without an unreasonably burdensome search. It is well established that an agency is not "required to reorganize [its] files in response to [a plaintiff's] request in the form in which it was made," [87] and that if an agency has not previously segregated the requested class of records production may be required only "where the agency [can] identify that material with reasonable effort." [88] Wilson's affidavits plainly show

**79.** J.A. 174.

**80.** J.A. 106. *See* pp. ———–— of 197 U.S.App. D.C., pp. 343–344 of 607 F.2d *supra.*

**81.** J.A. 78, 174.

**82.** J.A. 78.

**83.** J.A. 174.

**84.** J.A. 175.

**85.** *Id.*

**86.** J.A. 110 (emphasis in original). *See* Brief of Appellants at 26–27.

**87.** *Irons v. Schuyler*, 151 U.S.App.D.C. 23, 30, 465 F.2d 608, 615, *cert. denied*, 409 U.S. 1076, 93 S.Ct. 682, 34 L.Ed.2d 664 (1972).

**88.** *National Cable Television Ass'n, Inc. v. FCC*, 156 U.S.App.D.C. 91, 100, 479 F.2d 183, 192 (1973). *See* H.R.Rep.No.93–876, 93d Cong., 2d Sess. 5–6 (1974), U.S.Code Cong. & Admin. News 1974, p. 6271 (description of records requested must enable "a professional employee of the agency who [is] familiar with the subject area of the request to locate the record with a reasonable amount of effort").

**354**

that the effort required to locate the hypothesized "back-up" documents would be unreasonable here.

Second, plaintiffs argue that the Church Committee Report[89] refers to several documents that "appear to be within the scope of plaintiffs' FOIA request . . . , and copies of which could reasonably be expected to be in the possession of the CIA, but which defendants have neither identified or produced . . . ."[90] This argument is similarly unpersuasive. In their expanded request for "legislative history," plaintiffs sought access to Congressional reports and hearings on specific bills, and CIA materials

that may have been "the basis for testimony at hearings" or "included in . . . reports" on those bills. Fifteen of the seventeen documents plaintiffs cite from the Church Committee Report lie unmistakably outside the scope of their FOIA request.[91] The two remaining documents are transcripts of Congressional hearings in executive session.[92] In his affidavit, Wilson stated that these documents, "if they exist, are not held by the [CIA]."[93] Since the transcripts are Congressional materials, and since there is no indication in the Church Committee Report that the transcripts were received from or returned to the CIA,[94]

---

**89.** Final Report of the Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities, S.Rep.No.94–755, book 1, 94th Cong., 2d Sess. (1976) [hereinafter "Church Committee Report" or "Report"].

**90.** J.A. 178.

**91.** In their Brief at 21–23 n.7, plaintiffs refer to the following documents:

(a) Two memoranda from Wm. J. Donovan to the President, dated 1941 and 1944 (cited in Report at 481 n.24 & 482 n.28). These documents antedate by at least three years the legislation cited by plaintiffs; neither memorandum discusses any legislation whatever, nor was either prepared for testimony on legislation. *See* Wilson Affidavit, J.A. 183.

(b) Three memoranda from the CIA General Counsel to the Director, dated 1947–49 (cited in Report, *e. g.*, at 132 n.19, 72 n.7 & 492 n.70). These documents are internal CIA memoranda which were not prepared for testimony on the cited legislation and were in no way used in the legislative process. *See* Wilson Affidavit, J.A. 183.

(c) Three transcripts of Congressional testimony, dated 1975 (cited in Report, *e. g.*, at 141 n.1, 133 n.27 & 483 n.32). These documents postdate by 26 years the legislation cited by plaintiffs; the testimony was not given in hearings on that legislation.

(d) Three internal CIA memoranda, dated 1961–74, and one memorandum prepared by the Justice Dept., dated 1962 (cited in Report, *e. g.*, at 128 n.1a, 133 n.25, 478 n.10 & 133 n.26). These documents postdate by 13 years the legislation cited by plaintiffs; none of the memoranda was prepared for testimony on that legislation. *See* Wilson Affidavit, J.A. 183.

(e) Three draft legislative histories of the CIA prepared by the CIA Legislative Counsel's Office, dated 1967 (cited in Report, *e. g.*, at 71 n.5 & 480 n.19). These documents postdate by 18 years the legislation cited by plaintiffs; none

constitutes a report or hearings on that legislation and none was prepared for testimony on that legislation. *See* Wilson Affidavit, J.A. 183.

**92.** *Hearings before the Senate Armed Services Comm. on S. 758* (1947), *Hearings before the House Comm. on Expenditures in the Executive Departments on H.R. 2139* (1947) (cited in Report, *e. g.*, at 72 n.6). The Hearing Transcript identified by the CIA contains *some* of the testimony taken at the House hearings. Plaintiffs seek, and the CIA denies possession of, transcripts of the remainder of the testimony taken at those hearings.

**93.** J.A. 183.

**94.** The Church Committee Report cites only two documents that are said to be "on file at the CIA." The first is the "Statement of the Director of Central Intelligence [Hillenkoetter] Before the House Armed Services Committee [on] 8 April 1948" (cited in Report at 494 n.74). This is the "Hillenkoetter Statement" which the CIA identified and for the most part released. The second is so-called "Testimony of Gen. Hoyt S. Vandenberg before the House Armed Services Committee Hearing on H.R. 5871, 4/8/48" (cited in Report at 495 n.80). The CIA at oral argument denied possession of this document. We believe that the document in all probability does not exist. According to the Congressional Record Daily Digest, the only CIA officials to testify on H.R. 5871 before the House Armed Services Committee on 8 April 1948 were Hillenkoetter and Walter Pforzheimer. 94 Cong.Rec. D242 (1948). The error in the Church Committee Report seems easily explicable. The transcript of Hillenkoetter's 8 April 1948 testimony was entitled simply "Statement of the Director of Central Intelligence." Hillenkoetter was Director in 1948, and Vandenberg was Director in 1947. Apparently, the report wrongly attributed the 8 April 1948 statement of the unnamed CIA Director to Hillenkoetter's predecessor.

there is no reason to question the good faith of Wilson's asseveration.

Third, plaintiffs argue that the CIA's "pattern of obfuscation and delay" in dealing with them signals the Agency's *mala fides*. The Agency, they say, first denied having any responsive documents, then found some, then found some more: these "inconsistent positions" and this piecemeal disclosure are said to imply bad faith. We take a different view of the facts. Sara Holtz originally requested "legislative history," defined as Congressional hearings and reports; the CIA not unnaturally directed her to the Library of Congress. When Holtz replied that she wanted *unpublished* hearings and reports, the CIA identified the Hearing Transcript. When Goland and Skidmore said that they wanted not only hearings and reports, but Executive Branch back-up documents, the CIA identified the Vandenberg and Hillenkoetter Statements. The Agency's "piecemeal" pattern of disclosure followed faithfully the piecemeal pattern of requests, and thus here indicated, if anything, good faith rather than bad; indeed, this Court held as much in *Weissman v. CIA*.[95] The Agency's responses were not always timely; but in view of the well-publicized problems created by the statute's 10- and 20-day time limits for processing FOIA requests and appeals,[96] the CIA's delay alone cannot be said to indicate an absence of good faith.

The dissent, while not seriously questioning the CIA's good faith, says that discovery is needed in any event to ascertain whether the CIA personnel conducting the search used an "underinclusive" definition of "legislative history."[97] We disagree. The CIA personnel conducting the search evidently used the definition of "legislative history" that plaintiffs gave them, namely, "hearings, reports, and Executive Branch back-up documents." That this is so is suggested by the fact that the CIA's search produced hearings, reports, and Executive Branch backup documents. Nor do we think discovery was necessary to enable plaintiffs "to reformulate their request to eliminate confusion and the possibility of future lawsuits."[98] "Legislative history" admittedly is not a term whose meaning can be nicely cabined within bright lines; but it is the term plaintiffs used, and if any ambiguity was introduced thereby plaintiffs must reap what they have sown. It would be bizarre indeed if a plaintiff, simply by employing ambiguous language in his FOIA request, could assure himself of potentially harassing discovery for the purpose of dispelling the confusion he had engendered.

■ We hold, therefore, that plaintiffs have made no showing of CIA bad faith sufficient to impugn the Wilson affidavit, which on its face suffices to demonstrate that the CIA's search for responsive documents was complete. For this reason, the district court's grant of summary judgment without discovery was within its discretion.

D. *The CIA's Definition of Agency "Records."*

Plaintiffs contend that the CIA's definition of agency "records" is unduly narrow,[99]

---

**95.** 184 U.S.App.D.C. at 123, 565 F.2d at 698 (footnote omitted):

> The CIA dealt with the instant request in a conscientious manner. It disclosed much material, it released additional material as the result of an administrative appeal, and it came forward with newly discovered documents as located. Agency documents have been released to plaintiff-appellant on four separate occasions.

*See Fonda v. CIA*, 434 F.Supp. at 502, *appeal docketed*, No. 77–1989 (D.C. Cir. 4 Nov. 1977): "The CIA dealt with plaintiff's request in a conscientious manner. It disclosed much material and it came forward with newly discovered documents as located. . . ."

**96.** *See* J. T. O'Reilly, *supra* note 30, at ¶ 7.02.

**97.** *See* diss. op. at —— of 197 U.S.App.D.C., at 366 of 607 F.2d.

**98.** *See id.* at ——, at 366 of 607 F.2d.

**99.** 32 C.F.R. § 1900.3(g) (1976) defined CIA "records" to exclude (1) certain indexing and filing documents; (2) certain routing and transmittal sheets; (3) books and periodicals; (4) documents prepared by an agency other than the CIA; and (5) documents furnished by foreign governments under promise of confidentiality. The definition was amended in 1977 and the latter two exclusions were removed.

and that they have been injured because the Agency relied on this definition in denying them records to which they are entitled. The CIA responds that plaintiffs lack standing to maintain this challenge, arguing that it did not rely on the definition's "exceptions" in processing plaintiffs' request. The district court did not reach this issue. We do not reach it either. We have held that the CIA made a full search in good faith for responsive documents, and that the withheld material was withheld properly. Since plaintiffs have received all documents to which they are entitled, no live controversy remains between them and the CIA on the definitional issue.

### E. *Attorneys' Fees.*

The trial judge declined to award attorneys' fees to plaintiffs. The FOIA provides that attorneys' fees and costs may be assessed against the United States "in any case . . . in which the complainant has substantially prevailed."[100] Although a cursory reading of this opinion would not suggest that plaintiffs have passed this test,

they argue that even if all relief should be denied them they have "substantially prevailed" because the CIA released the Vandenberg Statement and portions of the Hillenkoetter statement *after* they commenced suit. Even if plaintiffs could show some causal nexus between their litigation and the CIA's disclosure,[101] which they have not done,[102] we doubt that plaintiffs could be said to have "substantially prevailed" if they, like Pyrrhus, have won a battle but lost the war.[103]

The judgment of the district court accordingly is

*Affirmed.*

BAZELON, Circuit Judge, dissenting:

I respectfully submit that the court today departs from well-established principles in this circuit in order to sustain summary judgment for the Central Intelligence Agency (CIA). The court also adopts a restrictive definition of "agency records" that erodes the right to disclosure under the

---

See 42 Fed.Reg. 24,049 (12 May 1977) (codified at 32 C.F.R. § 1900.3(g) (1977)).

**100.** 5 U.S.C. § 552(a)(4)(E) (1976).

**101.** *See Vermont Low Income Advocacy Council, Inc. (VLIAC) v. Usery*, 546 F.2d 509, 513 (2d Cir. 1976) (Friendly, J.):

> In order to obtain an award of attorney fees in an FOIA action, a plaintiff must show at minimum that the prosecution of the action could reasonably have been regarded as necessary and that the action had substantial causative effect on the delivery of the information.

**102.** *Res ipsa loquitur*, as it were, is of no assistance to plaintiffs here. The CIA's release of the Statement, to all appearances, represents its good-faith efforts to come forward with newly-discovered documents as located. *See* p. —— of 197 U.S.App.D.C., p. 355 of 607 F.2d & note 95 *supra*. The fact that these documents were released after plaintiffs brought suit on 28 Jan. 1977, to all appearances, owes to the time-consuming nature of a search for materials "used to prepare for congressional testimony," p. —— of 197 U.S.App.D.C., p. 353 of 607 F.2d *supra*; and to the fact that plaintiffs did not request access to such materials until 16 Dec. 1976. *See* pp. ———— of 197 U.S.App.D.C., pp. 343–344 of 607 F.2d *supra*. Plaintiffs' argument, in fine, boils down to

*post hoc, ergo propter hoc,* a fallacy that Congress wisely refrained from incorporating into the attorneys' fees provision of FOIA. *See VLIAC*, 546 F.2d at 514.

**103.** In order to win the war, plaintiffs need not obtain a judgment in court. *See Cuneo v. Rumsfeld*, 180 U.S.App.D.C. 184, 188–89, 553 F.2d 1360, 1364–65 (1977) (Tamm, J.) (citing cases); *VLIAC*, 546 F.2d at 513. They must, however, *substantially* prevail. *Cf. Cuneo*, 180 U.S.App.D.C. at 189, 553 F.2d at 1365 (plaintiffs substantially prevailed where, "[a]fter almost eight years of tedious, hard fought litigation, the government, faced with the appointment of a special master to review the case," supplied *all* the material requested). Even if the plaintiff is held to have substantially prevailed, the award of attorneys' fees lies within the district court's discretion. *See Cuneo*, 180 U.S.App.D.C. at 189–90, 553 F.2d at 1365–66; *VLIAC*, 546 F.2d at 512–13 (citing legislative history). An important factor in the exercise of this discretion is a determination whether the agency has been "recalcitrant in its opposition to a valid claim or [has] otherwise engaged in obdurate behavior." *Cuneo*, 180 U.S.App.D.C. at 190, 553 F.2d at 1366. The CIA's behavior was neither recalcitrant nor obdurate here.

Freedom of Information Act [1] (FOIA) and promotes secret law.

## I. THE NEED FOR DISCOVERY IN FOIA CASES

Without discovery, a party to litigation may not have access to facts necessary to oppose a motion for summary judgment. This problem is especially acute for plaintiffs in FOIA cases. Indeed, recognition of this dilemma has shaped a number of our decisions. In *Vaughn v. Rosen*, 157 U.S. App.D.C. 340, 484 F.2d 820 (1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), summary judgment was granted to the government on the basis of an affidavit declaring that the documents sought were exempt from disclosure. We reversed, recognizing that a FOIA plaintiff "obviously cannot know the precise contents of the documents sought; secret information is, by definition, unknown to the party seeking disclosure[,]" 157 U.S.App.D.C. at 343, 484 F.2d at 823; that "[t]his lack of knowledge . . . seriously distorts the traditional adversary nature of our legal system's form of dispute resolution[,]" *id.* 157 U.S.App. D.C. at 344, 484 F.2d at 824; and that, although "formal" discovery under the Federal Rules of Civil Procedure was not at issue,[2] procedures would have to be instituted to provide FOIA plaintiffs information roughly equivalent to what they would obtain through such discovery. "[C]ourts will simply no longer accept [from the defend-

ant agency] conclusory and generalized allegations of exemptions . . . but will require a relatively detailed analysis in manageable segments [of the contents of documents the agency seeks to withhold]." *Id.* 157 U.S.App.D.C. at 346, 484 F.2d at 826. We held such a procedure necessary—*before* summary judgment could be granted to the government—to enable a FOIA plaintiff "to argue with desirable legal precision for the revelation of the concealed information." *Id.* 157 U.S.App.D.C. at 343, 484 F.2d at 823.

Subsequently, the problem of ensuring adversariness arose in a context similar in several respects to the case at bar. In *Schaffer v. Kissinger,* 164 U.S.App.D.C. 282, 505 F.2d 389 (1974) (*per curiam*), before plaintiff was able successfully to pursue discovery, summary judgment was granted to the government on the basis of an affidavit stating that the documents plaintiff sought were classified "confidential" pursuant to Executive Order 11652, 3 C.F.R. 339 (1974), 50 U.S.C. § 401 (Supp. IV 1974). This court reversed, emphasizing that plaintiff had also filed an affidavit, as provided for by Rule 56(f), Fed.R.Civ.P.,[3] stating his belief that genuine issues existed as to whether the classification was properly effected and indicating that he could not verify that belief without discovery. The court based its holding on the language of Rule

---

**1.** 5 U.S.C. § 552 (1976).

**2.** The sole issue in *Vaughn* was whether the agency had demonstrated by affidavit that the documents sought were exempt from disclosure. Plaintiff simply contested the sufficiency of the affidavit. 157 U.S.App.D.C. at 343, 484 F.2d at 823. He did not attempt to bolster his case by serving interrogatories on agency officials, Rule 33, Fed.R.Civ.P., or by deposing them, Rules 30 and 31. Thus the question whether discovery under the rules should be permitted was not involved in the case.

In the present case, by contrast, plaintiffs urge that proper ventilation of the issues requires both discovery and more detailed affidavits. Plaintiffs seek to discover the circumstances surrounding the creation, and possession by the CIA, of the "hearing transcript," Part II, *infra*; the procedures and substantive criteria observed in classifying the "Hillenkoet-

ter statement," Part III(A), *infra*; the breadth of the CIA's search for responsive documents and the reasons for delay, Part IV, *infra*; and whether the agency's decision to disclose certain materials was prompted by this lawsuit, Part V, *infra*. In addition, plaintiffs contend that the affidavits filed by the CIA fail adequately to describe specific materials withheld and the reasons for nondisclosure, Parts II n.8 and III(B), *infra*.

**3.** (f) *When Affidavits Are Unavailable.* Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

56(f),[4] the policies underlying the FOIA, and common sense:

> Facts respecting the classification of the reports in question are solely in the control of the [defendant agency]. [Plaintiff] should be allowed to undertake discovery for the purpose of uncovering facts which might prove his right of access to the documents which he seeks.

164 U.S.App.D.C. at 284, 505 F.2d at 391. It is significant that there was no evidence in *Schaffer* bolstering plaintiff's claim that the affidavit submitted by the defendant agency was either executed in bad faith or was somehow erroneous. Without discovery, plaintiff had no means of producing such evidence. Relying solely on his Rule 56(f) affidavit, the court remanded the case with instructions to permit plaintiff to undertake discovery relevant to whether the reports in question were properly classified "confidential."

Today the court ignores both *Schaffer* and the "overwhelming emphasis [the FOIA places] upon disclosure," which guided our analysis in *Vaughn*. 157 U.S.App.D.C. at 343, 484 F.2d at 823. It does so in its zeal to protect the CIA from the burden of processing meritless FOIA requests for vital security information. I believe that such protection is available without eroding the requirements of the FOIA. First of all,

the CIA has made no claim that preparation of the index mandated by *Vaughn v. Rosen* would have been either overly burdensome or likely to disclose matters that should be kept secret. Moreover, the CIA offers neither evidence nor reason to find that a complete bar to discovery was necessary to protect its personnel from harassment. Proper supervision of the discovery process, as described in the margin,[5] could have avoided such problems. Through indexing and discovery the adversary system would have worked to maximize the probability that nonexempt information would be disclosed, thus fulfilling the central purpose of the FOIA.[6]

In sum, I submit that the grant of summary judgment to the CIA was premature. This position is reinforced by the factual ambiguity which pervades this record and which is exacerbated by the questionable legal standard on which the court distinguishes "agency records" from "congressional documents in an agency's possession."

## II. THE MAJORITY'S "CONTROL/PROPERTY" TEST

The dispute in this case centers on two documents which the CIA admittedly possesses and on the scope of the CIA's search

---

4. *See* note 3 *supra.*

5. The Federal Rules leave discovery in the hands of the parties in the first instance. The district court is charged with supervising the process when disputes arise. Thus, if the CIA believed plaintiffs' requests for discovery to be burdensome or otherwise objectionable, it had several alternatives to a motion for summary judgment that were more consonant with the spirit of the FOIA. It could, for example, have served objections to specific interrogatories to plaintiffs, who then would have had to decide whether to move in district court to compel answers under Rule 37(a)(2). The CIA could itself have moved in district court to terminate or limit a deposition, Rule 30(d), or for a protective order, Rule 26(c). The grounds for such a protective order, like those for refusing to answer specific questions, are generous. The district court "may make any order which justice requires to protect a party from annoyance, embarrassment, oppression, or undue burden or expense. . . ." *Id.* The district court may also, of course, recognize any privi-

lege asserted by a party seeking to resist discovery. Rule 26(c)(6). Thus discovery would neither have overly burdened the agency nor jeopardized its legitimate secrets, but would have provided both plaintiffs and the district court the information necessary to make the FOIA work.

6. *See generally* S.Rep.No.813, 89th Cong., 1st Sess. (1965); H.R.Rep.No.1497, 89th Cong., 2d Sess. (1966), U.S.Code Cong. & Admin.News 1966, p. 2418. The Senate Report states unequivocally that "[i]t is the purpose of the present bill . . . to establish a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language . . .." S.Rep.No.813, *supra,* at 3. *See also* H.R.Rep.No.1497, *supra,* at 3.

For a brief discussion of the history and purposes of the FOIA, see *EPA v. Mink,* 410 U.S. 73, 79–80, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973).

for additional documents responsive to plaintiffs' request for "legislative history." The first document is a photostatic copy of a transcript containing the minutes of hearings conducted by the House Committee on Expenditures in the Executive Department on June 27, 1947. (Hereinafter referred to as the "hearing transcript.") The second document is entitled "Statement of the Director of Central Intelligence before the House Armed Services Committee—8 April 1948." (Hereinafter referred to as the "Hillenkoetter statement.")

My brothers agree with the CIA's contention that the hearing transcript is simply unavailable to the public, whether or not specifically exempted from disclosure by the FOIA.[7] They find that the transcript is a "congressional document," not an "agency record," and is therefore wholly beyond the reach of the Act. The court reasons that "the circumstances attending [the transcript's] generation and the conditions attached to its possession by the CIA" plainly reveal that it "remains under the *control* and continues to be the *property* of the House of Representatives." Maj. op. at ——

of 197 U.S.App.D.C., at 347 of 607 F.2d (emphasis added). This conclusion is reached as a matter of law, thus eliminating any justification for discovery, on the basis of representations by CIA officials. The agency has stated by affidavit that the transcript contains testimony taken in Executive Session; typewritten on both the cover and first page of the transcript is the word "Secret"; the text reveals that the stenographer and typist were sworn to secrecy; the CIA retains a copy of the transcript for "internal reference purposes" only. *Id.* at —— of 197 U.S.App.D.C., at 347 of 607 F.2d, J.A. at 80.

In my view, the record in this case establishes as a matter of law that the hearing transcript *is* an "agency record," and the court is empowered to order it withheld only if it qualifies for nondisclosure under FOIA exemptions one or three.[8] First of all, the CIA claims to have had exclusive possession of this document for more than thirty years.[9] More importantly, the CIA acknowledges that it employs this information in interpreting its organic legislation[10] —*i. e.,* in making decisions with respect to

---

**7.** This is our first occasion to consider an agency's claim that the FOIA does not apply to information in its possession. *Compare, e. g., Soucie v. David,* 145 U.S.App.D.C. 144, 448 F.2d 1067 (1971), in which the issue was whether the Office of Science and Technology is an "agency" for purposes of the FOIA.

The Court of Appeals for the Tenth Circuit, however, has considered a claim similar to that raised here by the CIA. In *Cook v. Willingham,* 400 F.2d 885 (10th Cir. 1968) (per curiam), the court decided that presentence reports are not "agency records" even though in the possession of prison authorities. I disagree. *See* note 13 *infra.*

**8.** 5 U.S.C. §§ 552(b)(1), (3) (1976). I submit that the exemption one issue cannot be resolved on this record since the CIA has failed to reveal whether the procedures it followed in classifying the transcript comport with the requirements of Executive Order No. 11652. The Affidavit of George L. Cary, Legislative Counsel of the CIA (hereinafter "Cary Affidavit"), J.A. at 81, states only that a "Secret" classification marking has been affixed on the face of the transcript. It does not mention the other requirements contained in the Executive Order. *See generally* Part III(A) *infra.* I suggest also that neither exemption one nor exemption three can be held applicable to the transcript

until the CIA files an itemized description of its contents. *See generally id.;* Part III(B) *infra.*

**9.** Although no explanation of "agency records" is provided either in the FOIA itself or in the legislative history, the Justice Department has suggested that the Act requires disclosure of "records in being and in the possession *or* control of an agency." R. Clark, Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act 23 (1967), *reprinted* in Freedom of Information Act Source Book, S.Rep.No.82, 93d Cong., 2d Sess. 222 (1974) (emphasis supplied) (hereinafter "Attorney General's Memorandum"). This interpretation supports plaintiffs' position that possession suffices and is consistent with the general view advanced here that any attempt by the courts to define "agency records" must be shaped primarily by the policy of full disclosure underlying the Act. *See* notes 6 *supra* and 12 *infra.*

**10.** The Cary Affidavit states that the agency uses the transcript "in conjunction with congressional action on legislation dealing with the establishment of the Office of the Director of Central Intelligence, the Central Intelligence Agency and its functions." J.A. at 80.

policy and operations. The Act does not define "agency records." But the House and Senate reports reveal that the fundamental purpose of the FOIA was to open administrative policy and operations to the light of public scrutiny.[11]

I also find the court's "control property" test unpersuasive. We are not told what it meant by congressional "control" over a document in an agency's possession; or in what sense such a document can be considered congressional "property." The fact that Congress is a non-agency does not preclude a document or copy of a document it has *created* from ever qualifying as an "agency record." Federal agencies regularly receive documents created by non-agencies that obviously become "agency records" in the ordinary course. *See, e. g., Washington Research Project, Inc. v. HEW*, 164 U.S.App.D.C. 169, 504 F.2d 238 (1974) (grant application submitted to National Institute of Mental Health by noncommercial research scientist); *Irons v. Gottschalk*, 369 F.Supp. 403 (D.D.C.1974) (patent applications). Nor can the court rely on the view that because Congress may have somehow forbidden the CIA to disclose the transcript, thus exercising "control" over its contents, the transcript cannot be considered an "agency record." "Control" in this sense goes to the question whether a document is *exempt* from disclosure—not to whether it is an "agency record."[12] In every exemp-

---

**11.** The reports indicate that the FOIA was intended to strengthen the Public Information section of the Administrative Procedure Act, 5 U.S.C. § 1002 (1964), which was "drawn upon the theory that administrative operations and procedures are public property which the general public, rather than a few specialists or lobbyists, is entitled to know or have ready means of knowing with definiteness and assurance." H.R.Rep.No.1497, 89th Cong., 2d Sess. 3 (1966) (*quoting from* H.R.Rep.No.752, 79th Cong., 1st Sess. 198 (1945), U.S.Code Cong. & Admin.News 1966, pp. 2418, 2420. *See also* S.Rep.No.813, 89th Cong., 1st Sess. 8 (1965) ("[T]he very purpose for which [the Public Information Section] was intended [was to guarantee] the public's right to know the operations of its government."); *Dept. of the Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976); *SOC Development Corp. v. Mathews*, 542 F.2d 1116 (9th Cir. 1976).

My brothers would facilitate the flow of information between Congress and the Executive branch, maj. op. at —— of 197 U.S.App.D.C., at 346 of 607 F.2d, at the prohibitive cost of perpetuating the "secret law" we have condemned so frequently. *See e. g., Tax Analysts & Advocates v. IRS*, 164 U.S.App.D.C. 243, 246, 505 F.2d 350, 353 (1974); *Cuneo v. Schlesinger*, 157 U.S.App.D.C. 368, 173, 484 F.2d 1086, 1091 n.13 (1973).

**12.** This view of congressional "control" derives from the history of the FOIA as well as its plain language. Before the FOIA was enacted, the disclosure provisions of the Administrative Procedure Act allowed agencies to withhold information "in the public interest," or "for good cause shown," or on the ground that the person seeking the record was not "properly and directly concerned." 5 U.S.C. § 1002 (1964). The FOIA was designed specifically to eliminate these discretionary standards. *Soucie v. David*, 145 U.S.App.D.C. 144, 153–54, 448

F.2d 1067, 1076–77 (1971); *Bristol-Myers Co. v. FTC*, 138 U.S.App.D.C. 22, 25, 424 F.2d 935, 938 (1970); *American Mail Line, Ltd. v. Gulick*, 133 U.S.App.D.C. 382, 385, 411 F.2d 696, 699 (1969); H.R.Rep.No.1497, 89th Cong., 2d Sess. 1–2, 5–6, 8–9, 11 (1966); S.Rep.No.813, 89th Cong., 1st Sess. 3–6, 8, 10 (1965). Congress replaced them with a general requirement that all "records" be disclosed, 5 U.S.C. § 552(a)(3) (1976), offset by nine—and only nine—categories of privileged material. *Id.* § 552(b)(1)–(9). To avoid the creation of new loopholes, Congress expressly limited the grounds for nondisclosure to those specified in the exemptions: "This section does not authorize withholding information or limit the availability of records to the public, *except as specifically stated in this section.*" *Id.* § 552(c) (emphasis supplied).

My colleagues justify their view of congressional "control" on the theory that "Congress has broad powers to keep its documents secret . . . [and does not] waive[ ] its . . . prerogatives of confidentiality" when it transfers a "secret" document to an agency. Maj. op. at n.48.

I think it is fair to say that the court creates a tenth exemption for documents subject to what it terms "congressional prerogatives of confidentiality." To be sure, there can be no doubt about the existence of congressional power to maintain the secrecy of congressional proceedings, *see* U.S.Const. art. I, § 5, and thus to preserve the secrecy of documents in which the minutes of those proceedings are transcribed. The question in this case, however, is not whether such a power exists, but whether Congress continues to exercise it after transferring a document to an agency on an ostensibly permanent basis.

I read the FOIA as an unequivocal declaration by Congress that documents which have become part of the administrative process are subject to full disclosure unless specifically exempted.

tion 3 case, for example, the ultimate question is whether Congress has forbidden the agency to disclose the records sought. To illustrate, 26 U.S.C. § 7213(a)(1) makes it unlawful "to divulge to any person the amount of income . . . set forth . . in any income return . . .." This proscription does not mean that tax returns are not "agency records." Rather, tax returns are agency records that must be withheld under exemption 3. *See, e. g., Tax Analysts & Advocates v. Internal Revenue Service*, 164 U.S.App.D.C. 243, 505 F.2d 350 (1974).

It appears that the court would supplement the element of "control" with other concepts having to do with "property." The court's ultimate position, as I see it, would be that Congress has a property interest in, as well as control over, the *contents* of the transcript, the *paper* on which the contents are typed, and any *copy* of the transcript. But so sweeping a notion of congressional control and property is plainly at odds with the majority's concession that the Hillenkoetter statement is an "agency record." Maj. op. at —— of 197 U.S.App. D.C., at 348 of 607 F.2d. Both the transcript and the Hillenkoetter statement contain testimony originally prepared by intelligence officials and subsequently delivered

secretly before Congress. J.A. at 79–82. There is no logical reason to believe, and none has been suggested, that Congress would have an interest in controlling the testimony in one but not the other. The transcript contains, in addition to testimony, questions and comments by committee members. Perhaps, then, the testimony should be considered the property of the Executive branch, where it originated, and the comments the property of Congress. If so, to the extent the transcript consists of nonexempt testimony it should be disclosed under the majority's own rationale.[13] The only further difference between the two documents that is even arguably material is that the copy of the Hillenkoetter statement which the CIA possesses was apparently typed by agency employees, while the CIA's copy of the transcript was transcribed and typed by employees of Congress. As I have indicated, the origin of a piece of paper is simply not dispositive of the question whether it qualifies as an "agency record."

In any case, even assuming the "control/property" standard is the correct one, factual ambiguities in the record would preclude summary judgment. If Congress does, generally speaking, exert control over, and maintain property interests in, docu-

---

**13.** The majority asserts that this argument is "frivolous" because "the [h]earing [t]ranscript is not an agency record . . . .." Maj. op. at n.47. In so doing the majority not only overlooks the "property" element of its own test, but also assumes its conclusion. As I understand the legal standard the court proposes, the question whether a document is an "agency record" requires consideration of whether the document is the "property" of an agency. Surely, then, the majority must consider whether the testimony contained in the transcript is the "property" of the Executive branch.

That the majority fails to consider fully the perplexity of its "property" rationale is reflected also by its reliance on *Cook v. Willingham*, 400 F.2d 885 (10th Cir. 1968) (per curiam). In that case the court held that a presentence report in the hands of prison authorities was not an "agency record" because it "was made for the use of the sentencing court and thereafter remains in the exclusive control of that court despite any joint utility it may eventually serve." *Id.* Perhaps the sentencing

court can be said to have a "property" interest in a presentence report since such reports are prepared for that court by an arm of that court—the United States Probation Office. *See* Rule 32(c)(1), Fed.R.Crim.P. Since the contents of a presentence report originate with the courts, however, not with the Executive branch, such reports would appear distinguishable under the majority's standard from the testimony contained in the hearing transcript at issue here.

In any event, I believe that *Cook* was wrongly decided. The brief opinion in that case fails to clarify exactly how the sentencing court exercises control over a document in the possession of prison authorities. Moreover, the opinion fails to envision the possibility that the sentencing court could ever relinquish such control. In my view, once the prison authorities had possession of the report for use in connection with administrative decisions (e. g., parole release), the report became a quintessential "agency record." *See* note 11 *supra* and accompanying text.

ments possessed by federal agencies, the majority's test generates a need to ascertain the methods by which such control is exercised and relinquished, and the means by which such property interests are created and extinguished. In this case discovery is necessary specifically to determine whether Congress or the committee that conducted the hearings ever instructed the CIA to preserve the secrecy of the transcript, and, if so, for how long. Apparently the transcript itself contains no such express instruction, and the CIA concedes that the source of the "Secret" classification is unknown. J.A. at 80. The fact that the committee met in Executive Session serves only to raise further questions concerning the nature of the "longstanding practice" governing secrecy of such sessions to which the majority refers. Maj. op. at n.45.[14] Also, discovery is necessary to determine whether, in the thirty years during which the CIA has possessed the transcript, it has ever acted inconsistently with congressional "control," as by disclosing the contents of the transcript to other agencies or individuals without seeking congressional authority. Finally, plaintiffs should be permitted to pursue further the question whether Congress itself has explicitly or implicitly indicated that it no longer considers preserva-

tion of the transcript's secrecy to be crucial. Even without discovery plaintiffs have demonstrated that the Church Committee has published portions of the transcript.[15]

## III.  THE CIA'S CLAIMS OF EXEMPTION

The majority adopts the CIA's declaration by affidavit that the withheld portions[16] of the Hillenkoetter statement are exempt from disclosure as a matter of law on grounds of national security. This result is reached by two separate paths—directly, under FOIA exemption one, 5 U.S.C. § 552(b)(1) (1976), and indirectly, by incorporating into FOIA exemption three, id., § 552(b)(3), the nondisclosure provisions of the National Security Act of 1947, 50 U.S.C. § 403(d)(3), and the Central Intelligence Agency Act of 1949, 50 U.S.C. § 403g. See generally Maj. op. at ————— of 197 U.S. App.D.C., at 348–352 of 607 F.2d. The majority may well be correct in concluding that disclosure of the withheld material would threaten our national security. Congress, however, has unambiguously expressed its intention that such determinations shall be made de novo. 5 U.S.C. § 552(a)(4)(B) (1976).[17] The affidavits submitted by the CIA are no substitute.

**14.** The majority acknowledges that H.R.Rule XI(1)(k)(7), which governs disclosure of testimony taken in Executive Session of the House of Representatives, did not exist in 1947, when the hearings in question were conducted. Maj. op. at n.45. The majority states, however, that "the Rule simply formalized long-standing practice . . . [requiring that] 'all testimony taken in executive hearings . . . be secret and . . . not be released . . . without the approval of a majority of the subcommittee.'" Id. (quoting from S.Rep.No.5, 81st Cong., 1st Sess., 3–4 (1949)).

The "practice" to which the court refers is ambiguous at best. For one thing, the court relies on practice in the Senate, and the House may have functioned differently. And the practice of either branch of Congress may have provided for disclosure without approval by committee after a specified duration. Moreover, assuming Senate practice is relevant, the court should consider whether disclosure of portions of the transcript by the Church Committee, see note 15 infra, might substitute for approval by the committee that originally conducted the hearings.

**15.** The Church Committee Report, Foreign and Military Intelligence, Final Report of the Select Committee to Study Governmental Operations with respect to Intelligence Activities, S.Rep. No.94–755, 94th Cong., 1st Sess., pt. I (1976), refers to or quotes from the hearing transcript at 72n. 6; 129n. 2, 7; 136n. 32–34; 138n. 41a; 480n. 17, 487–488n. 53; and 488n. 56–57.

**16.** The CIA has deleted approximately 20%, or 23 pages, of the Hillenkoetter statement. Brief for the Government at 21.

**17.** Congress made its will clear in Pub.L.No.93–502, 88 Stat. 1561 (1974), which amended the FOIA in part to overrule the decision by the Supreme Court in EPA v. Mink, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). In Mink the Court had interpreted 5 U.S.C. § 552(b)(1), which exempted from disclosure those matters "specifically required by Executive order to be kept secret in the interest of the national defense or foreign policy," not to allow judicial review of Executive security classifications and accordingly not to allow in camera inspection

## A. *Exemption One* [18]

In the case of exemption one the district court must determine the propriety of a document's classification according to "both procedural and substantive criteria contained in the Executive Order under which it was classified." *Zweibon v. Mitchell,* 170 U.S.App.D.C. 1, 49, 516 F.2d 594, 642 (1975) (*quoting from* H.R.Rep.No.1380, 93d Cong., 2d Sess., 12 (1974)); *see also Halperin v. Department of State,* 184 U.S.App.D.C. 124 at 128, 565 F.2d 699 at 703 (1977). Such determinations could not have been made on the record in this case because the affidavit submitted by the CIA fails to reveal the date on which the Hillenkoetter statement was originally classified. J.A. at 81. Without discovery, the district court could merely speculate about which Executive Order, if any,[19] governed the original classification.

The district court apparently relied on an asserted reclassification of the Hillenkoetter statement in concluding that "the withheld portions . . . have been properly classified according to the provisions of Executive Order No. 11652," J.A. at 189, which

is the Order presently in force. *See* 3 C.F.R. 339 (1974), 50 U.S.C. § 401 (Supp. IV 1974). Perhaps discovery pertaining to the validity of the original classification would be unnecessary if reclassification under Executive Order No. 11652 had been properly effected. The district court, however, was plainly in error. Section 4(A) of the Executive Order requires that classified material "show on its face its classification and whether it is subject to or exempt from the General Declassification Schedule. It shall also show the office of origin, the date of preparation and [the date of] classification . . . ." Excepting that the word "Secret" and the date of preparation appear on the face of the Hillenkoetter statement, J.A. at 80, there is no indication in the record that these procedures were followed.

We said recently in *Halperin v. Department of State,* 184 U.S.App.D.C. 124, 565 F.2d 699 (1977), that the government cannot claim a statutory exemption from the FOIA if it has failed to comply with the procedures necessary to give such exemption effect.[20]

of a contested document bearing a security classification so that nonsecret matter could be separated from secret matter and ordered disclosed. 410 U.S. at 81–84, 93 S.Ct. 827. Congress responded by amending the language of § 552(b)(1), *see* note 18 *infra,* to provide clearly for judicial review of both the procedural and substantive propriety of the classification. It also specified that where the documents sought are withheld on the basis of any of the nine exemptions, "the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld . . . ." Pub.L.No.93–502, § 1(b)(2), 88 Stat. 1562 (1974); *see also* H.R. Rep.No.1380, 93d Cong., 2d Sess., 2, 12 (1974).

**18.** FOIA's first exemption immunizes from disclosure those matters that are

(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order. 5 U.S.C. § 552(b)(1) (1976).

**19.** The record reveals only that the Hillenkoetter statement was prepared in April, 1948. At that time, there was no Executive Order in existence governing all security classifications. The first such Order was issued in 1950 by

President Truman. See Executive Order No. 10290, 3 C.F.R. 789 (1953). The Office of War Information, however, had in 1942 issued a government-wide regulation dealing with security classification under the authority of Executive Orders 9103 and 9182. *See* Office of War Information Regulation No. 4, issued Sept. 28, 1942, *amended,* Nov. 13, 1942. *See generally* H.R.Rep.No.93–221, 93d Cong., 1st Sess., 4–14 (1973). This regulation established both substantive criteria and procedural requirements. *See id.* at 7. Thus, assuming the Hillenkoetter statement was classified originally in 1948, discovery was necessary to determine whether these substantive criteria and procedural requirements were followed.

**20.** *See also Schaffer v. Kissinger, supra.*

In *Halperin,* we did not hold that the document in question necessarily had to be disclosed to plaintiff. Rather, we remanded the case to the district court for a determination of whether disclosure would "do grave damage to the national security . . . ." *Id.,* 184 U.S. App.D.C. at 131, 565 F.2d at 706. The decision to remand was made reluctantly:

Having failed to follow the procedures established by their own branch of government, appellants ask us in effect to save them from the consequences of that failure by providing

## B. *Exemption Three* [21]

In the case of exemption three the district court must determine whether the material withheld is specifically exempted from disclosure by statute. I have no quarrel with the court's holding that 50 U.S.C. §§ 403(d) and 403g specifically require that "intelligence sources and methods" be kept secret. Maj. op. at ———— of 197 U.S. App.D.C., at 349–350 of 607 F.2d. I believe the court is mistaken, however, in eschewing "discovery or *in camera* inspection to test for the presence of segregable, non-exempt material" on what is essentially the ground that "the Agency has already segregated and released 80% of the Hillenkoetter statement to plaintiffs." *Id.* at n.65. This rationale violates the court's statutory responsibility to undertake *de novo* review for "reasonably segregable material," 5 U.S.C § 552(b) (1976); *Depart-*

*ment of the Air Force v. Rose,* 425 U.S. 352, 374, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), and places the disclosure decision squarely in the hands of the CIA.[22]

Our decisions establish that in national security cases as in all others, summary judgment is proper without discovery or *in camera* inspection *only if* the agency has submitted an itemized index that "subdivide[s] the document under consideration into manageable parts cross-referenced to the relevant portion of the Government's justification." *Vaughn v. Rosen, supra,* 157 U.S.App.D.C. at 347, 484 F.2d at 827. *See also Weissman v. CIA,* 184 U.S.App.D.C. 117, 123, 565 F.2d 692, 698 (1977) (*as amended,* April 4, 1977); *Phillippi v. CIA,* 178 U.S.App.D.C. 243 at 247, 546 F.2d 1009, at 1013 (1977). *Cf. Mead Data Central, Inc. v. Department of the Air Force,* 184 U.S.App. D.C. 350, at 358–360, 566 F.2d 242 at 250–

an exemption the Congress did not create. The power of a court to refuse to order the release of information that does not qualify for one of the nine statutory exemptions exists, if at all, only in "exceptional circumstances in which a court could fairly conclude that Congress intended to leave room for the operation of limited judicial discretion." The need for this restriction on the power of the courts is apparent here. A broad judicial power to refuse to order disclosure of non-exempt information that a court feels would damage the national interest could obviously operate to frustrate the requirements of FOIA. *Id.* 184 U.S.App.D.C. at 131, 565 F.2d at 706 (citations omitted). Narrowly circumscribing its discretion, we directed the district court to be "guided by an exacting standard similar to that suggested in *Near v. Minnesota,* [283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357 (1931)]." *Halperin,* 184 U.S.App.D.C. at 132, 565 F.2d at 707. *See also Tax Analysts & Advocates v. IRS,* 164 U.S.App.D.C. 243, 248, 505 F.2d 350, 355 (1974); *Getman v. NLRB,* 146 U.S.App. D.C. 209, 450 F.2d 670, 678 (1971); *Soucie v. David,* 145 U.S.App.D.C. 144, 154, 448 F.2d 1067, 1077 (1971).

In this case, as in *Halperin,* since the agency failed in reclassifying the Hillenkoetter statement to follow the procedures necessary to give exemption one effect, there is no need to address the question whether the reclassification satisfied the substantive criteria contained in Executive Order No. 11652. I should note, however, that for want of an itemized index of the contents of the Hillenkoetter statement, *see* Part III(B) *infra,* the district court could not

possibly have given the requisite *de novo* consideration to the question of substantive classifiability.

**21.** FOIA's third exemption immunizes from disclosure those matters that are

specifically exempted from disclosure by statute . . . provided that such statute (A) requires that the matters be withheld . . . in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld. 5 U.S.C. § 552(b)(3) (1976).

**22.** The court asserts that "[e]xemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents . . . ." Maj. op. at —— of 197 U.S.App.D.C., at 350 of 607 F.2d. On the contrary, the applicability of this exemption, like any other, depends entirely on whether the factual contents of the particular materials withheld are such that the statutory criteria for nondisclosure are satisfied. The sole difference between exemption three and other FOIA exemptions is that in the case of exemption three, these criteria are not provided by the FOIA itself but by other statutes. For example, in the present case the relevant criteria are established by the National Security Act of 1947, 50 U.S.C. § 403(d)(3), and the Central Intelligence Act of 1949, 50 U.S.C. § 403g. I should note that the court appears to realize as much, and later states that the "withheld material [must be included] within [the exempting] statute's coverage." Maj. op. at —— of —— U.S.App.D.C., at 350 of 607 F.2d.

252 (1977). Such an index, as I discussed earlier, "can . . . be subjected to criticism by the party seeking the document. If *in camera* examination of the document is still necessary, the court will at least have the benefit of being able to focus on the issues identified and clarified by the adversary process." *Phillippi v. CIA, supra,* 178 U.S.App.D.C. at 247, 546 F.2d at 1013; *Vaughn v. Rosen, supra,* 157 U.S.App.D.C. 346–48, 484 F.2d at 826–828. *See also* S.Rep.No.93–854, 93d Cong., 2d Sess., 14–15 (1974).

The affidavit filed here by the CIA, quoted in part in the court's opinion at 21, plainly fails to supply the information necessary to facilitate the adversary process and *de novo* review. First, the affidavit speaks for the most part only of intelligence "devices," "sources," "methods," and "operations." Essentially it parrots the language of the exempting statutes, 50 U.S.C. §§ 403(d)(3) ("intelligence sources and methods") and 403g (intelligence "functions"), rather than providing the detailed description the "requesting party [needs] to present its case effectively," *Mead Data Central, Inc. v. Dept. of the Air Force,* 184 U.S.App.D.C. 350 at 359, 566 F.2d 242 at 251 (1977); *Vaughn v. Rosen, supra,* 157 U.S.App.D.C. at 343–44, 484 F.2d at 823–24, 828, and a reviewing court requires to make an independent evaluation of an agency's exemption claims.[23] Second, as plaintiffs point out, the affidavit "makes no effort to match its assertions to given pages or para-

graphs in the [Hillenkoetter] statement." Brief for Appellants at 33. For want of an itemized index, it is impossible to determine whether all nondisclosed portions of the statement have been described, much less properly withheld.

## IV. THE CIA'S SEARCH FOR RESPONSIVE DOCUMENTS

The court refuses to permit plaintiffs to conduct discovery pertinent to the scope of the CIA's search for "legislative history" on the ground that affidavits submitted by the agency reveal as a matter of law that the search was thorough. The majority emphasizes the assertion by the agency's Information and Privacy Coordinator that the "CIA 'interpreted [plaintiffs'] request broadly enough to ensure that [it] would locate all documents within the scope of the request.'" Maj. op. at —— of 197 U.S.App.D.C., at 353 of 607 F.2d; J.A. at 78. The majority states that "the Agency's good faith would not be impugned unless there were some reason to believe that [additional responsive] documents could be located without an unreasonably burdensome search." Maj. op. at —— of 197 U.S.App.D.C., at 353 of 607 F.2d. Finding that the CIA did, in fact, act in good faith, the court refuses to reach plaintiffs' contention that the agency's definition of "agency records," 32 C.F.R. § 1900.3(g) (1976),[24] is unduly narrow and may have served as an impermissible basis for withholding otherwise responsive documents. Maj. op. at —— –– ——

**23.** My colleagues find that the affidavit "could not have been much more detailed without 'compromis[ing] the secret nature of the information.'" Maj. op. at —— of 197 U.S.App. D.C., 352 of 607 F.2d (*quoting from Vaughn v. Rosen, supra,* 157 U.S.App.D.C. at 346–47, 484 F.2d at 826–27). This may be true. An affidavit couched essentially in the language of the exempting statute, however, is plainly of no more usefulness to plaintiffs or the court than an affidavit simply declaring that the withheld material qualifies for a particular exemption. If for some reason agencies must be especially guarded in describing withheld material in so-called "national security" cases, the indexing requirement may not provide an adequate means in such cases of ensuring that the adversary process works and of facilitating *de novo* review. It may therefore be necessary, *espe-*

*cially* in national security cases, for the District Court to inspect withheld documents, or at least a reasonable sample thereof, *in camera. But compare Weissman v. CIA, supra,* 184 U.S. App.D.C. 122, 565 F.2d at 697 ("*in camera* proceedings are particularly a last resort in 'national security' situations.").

**24.** The CIA's definition excludes certain (1) "[i]ndex, filing, and museum documents;" (2) "[r]outing and transmittal sheets and notes;" (3) "[b]ooks, newspapers, magazines, and similar publications;" (4) "[d]ocuments and records prepared or originated by [other] agenc[ies];" and (5) "[d]ocuments and records furnished by foreign governments . . . on the understanding . . . [that they be] kept in confidence."

of 197 U.S.App.D.C., at 355–356 of 607 F.2d.

The court may well be correct in concluding that the CIA has acted in good faith, and that its search was thoroughly responsive to plaintiffs' request. My disagreement, again, concerns not the substance but the timing of the judgment in favor of the agency.

As I understand plaintiffs' position, although they do raise questions about the CIA's good faith,[25] the real issue here concerns the scope the agency attributed to the term "legislative history." Clearly, whether or not the CIA acted in good faith, its understanding of "legislative history" shaped its search for responsive documents. It is not enough for the CIA simply to state that it "interpreted the request broadly." Without discovery of the precise definition employed by the persons who conducted the search, plaintiffs were in no position to argue effectively that the search was un-

der-inclusive.[26] Such discovery, of course, might have led the parties to agree on an appropriate search. At a minimum, such discovery would have enabled plaintiffs to reformulate their request to eliminate confusion and the possibility of future lawsuits. Also, such discovery would have revealed whether the persons conducting the search did in fact withhold otherwise responsive documents on the basis of the CIA's definition of "agency records." If so, the question would arise whether that definition is permitted by the FOIA.

## V.  ATTORNEY'S FEES

Plaintiffs claim to be entitled to an award of attorney's fees on the ground that the CIA produced several documents only after this litigation was instituted.[27] The court rejects this claim in part because plaintiffs have not shown the required "causal nexus between their litigation and the CIA's disclosure." Maj. op. at —— of

---

**25.** Plaintiffs point out that on March 10, 1976, six weeks after their complaint had been filed in district court and nearly five months after their original FOIA request had been filed with the CIA, they received notification that the agency had conducted a subsequent search and "recently identified" additional responsive documents that "had not previously been located." Brief for Appellants at 4–7; John F. Blake letter, J.A. at 129. They contend that the CIA's delay in responding to their request raises an inference of bad faith that justifies discovery with respect to the scope of the search. Brief for Appellants at 20. At least one district court judge would apparently agree with them. *See Ass'n of National Advertisers, Inc. v. FTC,* 38 Ad.L.2d 643 (D.D.C. April 1, 1976) (production of additional documents after six-month delay "presents a substantial issue of the completeness of the agency search." *Id.* at 645).

**26.** The court rejects the need for discovery of the definition of "legislative history" employed by the agency in its search because this is the "term plaintiffs used, and if any ambiguity was introduced thereby plaintiffs must reap what they have sown." Maj. op. at —— of 197 U.S. App.D.C., at 355 of 607 F.2d.

I submit that this view is at war with the purposes of the FOIA. A FOIA request may of necessity be based on imperfect information— or none at all—about the particular agency's methods of classifying and filing information. FOIA's legislative history acknowledges the problem, indicating that a request must supply only "a reasonable description enabling the

Government employee to locate the requested records." S.Rep.No.813, 89th Cong., 1st Sess. 8 (1965). *See also Sears v. Gottschalk,* 357 F.Supp. 1327 (D.C.Va.1973). To require more specificity would be futile, particularly where, as here, the requestor does not know whether or to what extent responsive documents exist. Moreover, FOIA's legislative history reveals that the requirement that a request identify the records sought, 5 U.S.C. § 552(a)(3), is "not to be used as a method of withholding records." S.Rep.No.813, *supra,* at 8, *Accord, Bristol-Myers Co. v. FTC,* 138 U.S.App.D.C. 22, 25, 424 F.2d 935, 938 (1970). *See also* Attorney General's Memorandum, *supra* note 9, at 24. It follows that ambiguity resulting from imperfect information should not be used as a justification for prohibiting the discovery necessary to make the FOIA work.

In this case I would not cripple plaintiffs' right to access to agency records because there is ambiguity in their request. What they apparently seek is any and all information in whatever form pertaining to the CIA's organic statutes. Yet a request so formulated would provide agency employees with scarcely any more guidance than one for "legislative history." The problem, quite simply, is that plaintiffs do not know what form such information will take, or where it might be located in the CIA's files. I would rely on the discovery process to eliminate such a problem.

**27.** J.A. at 129. *See* note 25 *supra.*

197 U.S.App.D.C. at 356 of 607 F.2d. I do not disagree with the court's legal standard. What concerns me, however, is that here again plaintiffs have had no opportunity to make their case. A showing of an agency's subjective reasons for producing documents is difficult to accomplish at all events. It is virtually impossible without discovery.

## VI. CONCLUSION

In a recent FOIA case Judge Wilkey remarked that "[t]he data which plaintiff seeks to have produced . . . are matters of interest not only to him but to the nation." *Weisberg v. Department of Justice*, 177 U.S.App.D.C. 161 at 164, 543 F.2d 308 at 311 (1976). This observation applies with particular force to the legislative history underlying the creation of the CIA. I regret that an issue of such importance has not been resolved in accordance with principles of summary judgment.

On Appellants' Motion to Vacate and Petition for Rehearing

Opinion PER CURIAM.

Dissenting opinion filed by Circuit Judge BAZELON.

PER CURIAM.

This petition for rehearing was occasioned by an inexcusable lapse on the part of the Central Intelligence Agency (CIA). While litigating the appeal whose disposition is here questioned, the CIA discovered but failed to disclose within any reasonable time hundreds of documents which were arguably responsive to plaintiff-appellants' Freedom of Information Act request. The documents' existence was not revealed until after we issued our decision, affirming summary judgment for the CIA. The failure to make the disclosure plainly called for naturally casts a cloud over the entire proceeding. Nevertheless, and without the barest intention of countenancing the CIA's untimely disclosure, on analysis of the issues argued and decided, we decline to disturb

our judgment, save on the question of attorneys' fees. With respect to that question, we remand to the district court to reconsider its ruling in light of the altered circumstances of this case.

## I. FACTS

We issued our opinion on 23 May 1978, affirming the district court's grant of summary judgment to the CIA. On 30 May 1978, a week after the issuance of our opinion, the CIA informed the Justice Department that it had found hundreds of additional documents that might be responsive to plaintiffs' FOIA request. The Department promptly informed plaintiffs and this court of CIA's discovery. On 6 June 1978 plaintiffs filed a petition for rehearing and suggestions for rehearing en banc.[1]

On 14 June 1978 the CIA released to plaintiffs' counsel thirty of the additional documents. In an accompanying letter the Agency stated that, even though it did not believe that all of the documents fell within plaintiffs' FOIA request, it was releasing them anyway to assist plaintiffs' scholarly research. The letter explained further that:

[m]ost of these documents were discovered late last fall, and additional documents earlier this year, by the librarian of the Office of General Counsel. She discovered all of these documents which were unindexed, in the course of her independent research on legal projects unrelated to the *Goland* case. Although a sampling of the documents last fall revealed their possible relevance to *Goland*, it was not until late May 1978, when a partial list of the documents was completed by the law librarian, that the extent of the documents, and the significance of some of the documents to the *Goland* FOIA request, were fully appreciated.

The following week, on 23 June 1978, the CIA released to plaintiffs' counsel an additional 291 documents. Also on that date CIA's associate general counsel, Ernest Mayerfeld, wrote the Justice Department to

---

1. The effect of this timely petition has been to suspend issuance of our mandate.

explain the circumstances surrounding the Agency's discovery and release of additional documents:

Most of these documents were discovered last fall by the Office of General Counsel librarian in the course of extensive research on two projects unrelated to the *Goland* litigation. Many of these documents were found in a CIA installation outside of Washington where inactive records are kept, only after great diligence and persistence by the librarian in connection with her research. She became aware of the existence of these documents, which had been stored in cardboard boxes and had not been organized in any fashion, as a result of several interviews with current and former CIA employees conducted in connection with her research projects. These documents were not indexed and could not have been found under normal FOIA search procedures.

I can state most emphatically that there was no intent within the CIA to conceal the fact that these documents had been found. The librarian, who had some personal familiarity with the *Goland* case and thus recognized that some of the documents which she had found might have some bearing on the *Goland* litigation, immediately (i. e. in late November or early December 1977), informed the General Counsel, the Deputy General Counsel and the undersigned. Because at that time the documents had not been organized or analyzed, and because it was not immediately apparent which if any were within the scope of the FOIA request in *Goland*, the General Counsel instructed the librarian to begin to organize these documents and segregate from among them those documents which qualified for designation as "legislative history."

The law librarian proceeded with her assigned task, but her extensive involvement in other routine duties prevented her completing this task as expeditiously as might have been desired. It should be noted that during this period she was engaged in a major reorganization of the law library which incidentally also entailed a physical move from one location to another. Also, although the Table of Organization of the Office of General Counsel called for an assistant law librarian, no one was appointed to that position until March 1978. The law librarian first completed a partial inventory of the additional documents on May 19, 1978 and shortly thereafter it was decided that all the newly-found documents would be released, subject to FOI[A] deletions, and you were immediately informed.

This, then, appears to be the sequence of events: (1) The district court granted summary judgment to the CIA on 26 May 1976. (2) Plaintiffs filed their notice of appeal on 23 July 1976. (3) In November or December 1977—while this appeal was still pending *but more than a year-and-a-half after the district court's decision*—the CIA discovered additional documents, some of which arguably fell within the scope of plaintiffs' FOIA request. (4) Failing to inform plaintiffs, the Justice Department, or this court of the discovery, the CIA undertook a sluggish four-month examination of the documents. (5) It was not until a week after we issued our 23 May 1978 decision that CIA finally revealed its discovery and began releasing the documents.

Contending that this sequence of events completely undermines the basis of our 23 May decision, plaintiffs have now filed a motion summarily to vacate that decision.[2] Plaintiffs' motion states in pertinent part:

The majority opinion affirmed the district court decision based on CIA affidavits. It appears that these affidavits are incorrect. . . . [T]he CIA has now produced . . . additional documents "discovered late last fall and additional documents earlier this year." Moreover, [the CIA] concedes that "a sampling of the documents last fall revealed their possible relevance to *Goland* . . . ."

**2.** The motion was filed 16 June 1978—between the CIA's release of 30 documents on 14 June 1978 and its release of 291 documents on 23 June 1978.

No explanation has been offered by the CIA or the Justice Department for the CIA's strategy decision to stand mute as to the status of the affidavits relied upon by the Court until *after* the decision was handed down on May 23. Indeed, it appears the CIA chose to withhold this crucial information from the Justice Department until after such decision was handed down.

Based on these admissions and concessions . . . it should now be abundantly clear that discovery is appropriate in this case and in any event, attorneys' fees should be awarded because of the manner in which the CIA has chosen to conduct itself in this litigation.

Plaintiffs' contention seems to be grounded on three distinct facts or occurrences: first, the fact that additional responsive documents were found to exist; second, the fact that CIA delayed informing this court of the documents until the court had already issued its decision; and third, the fact that CIA ultimately released the documents to plaintiffs. Plaintiffs believe that these three facts warrant vacating the decision of 23 May 1978, at least in part.

## II. DISCUSSION

In our 23 May decision we resolved five separate issues. We held: (1) that the CIA was not required under the FOIA to release a congressional hearing transcript that remained under the control of Congress; (2) that the CIA had properly deleted portions of the so-called "Hillenkoetter Statement" pursuant to Exemption 3 of the FOIA; (3) that, on the record, the CIA's search for documents responsive to plaintiffs' FOIA request was adequate and that the district court's grant of summary judgment without discovery was within its discretion; (4) that the CIA's definition of "agency records" was not in controversy; and (5) that plaintiffs' counsel were not entitled to attorneys' fees.

After carefully reviewing plaintiffs' contentions and the circumstances surrounding the discovery and belated disclosure of the documents, we find no occasion to disturb our affirmance as to issues (1) through (4), but we do vacate that part of our decision affirming the denial of attorneys' fees and remand to the district court for reconsideration of that issue.

## A. Thoroughness of Search Issue

We based our determination of the "search" issue, as did the district court, on three affidavits of Gene F. Wilson, the CIA's Information and Privacy Coordinator. We concluded "that Wilson's sworn affidavits on their face are plainly adequate to demonstrate the thoroughness of the CIA's search for responsive documents. The affidavits give detailed descriptions of the searches undertaken, and a detailed explanation of why further searches would be unreasonably burdensome." [3]

### 1. Plaintiff's Theory

Plaintiffs contend that the discovery of additional documents indicates that the CIA affidavits in this case, relied upon by both the district court and this court, "are incorrect." Therefore, they argue that we should vacate our decision, or at least that portion of the decision dealing with the "search" issue, because it was predicated on inaccurate affidavits. We disagree.

As a substantive matter, the mere fact that additional documents have been discovered does not impugn the accuracy of the Wilson affidavits. *The issue was not whether any further documents might conceivably exist but whether CIA's search for responsive documents was adequate.* The Wilson affidavits never stated that no further documents existed; they merely described the scope of the searches that had been undertaken and stated that no additional documents could be located absent an extraordinary effort not required by the FOIA. As we indicated in our opinion, an agency is required only to make

---

3. Maj. opin. at —— of 197 U.S.App.D.C., at 353 of 607 F.2d.

reasonable efforts to find responsive materials;[4] it is not required to reorganize its filing system in response to each FOIA request. The circumstances surrounding the discovery of additional documents as described in CIA's letters of 14 and 23 June do not contradict the statements made in the Wilson affidavits. According to CIA, the discovery of these documents was entirely adventitious. They were found by the law librarian in the course of independent research on projects unrelated to the *Goland* litigation. The documents were not indexed; they were found, only after extraordinary effort, stored in cardboard boxes primarily among the 84,000 cubic feet of documents at CIA's retired-records center outside of Washington. According to CIA, the documents "could not have been found under normal FOIA procedures." Thus, it would appear that the new facts before us now do not really conflict with the facts as presented to the district court and reflected in the record upon which our decision was based, and would not, as a substantive matter, prompt us to vacate our affirmance.

■■■ Concededly, the discovery of additional documents is more probative that the search was not thorough than if no other documents were found to exist. Moreover, the delay in disclosing the documents at least arguably evidences a lack of vigor, if not candor, in responding to FOIA requests. However, a disappointed litigant may not avail herself of every imaginable inference from newly disclosed facts in order to upset a final judgment. The occasions when newly discovered evidence or changed circumstances will warrant setting aside a final judgment are limited procedurally as well as substantively.

2. Applicable Principles of Appellate Review

■■■ A final district court judgment may be altered on direct review only through two procedures.[5] One, of course, is the present appeal. The other is a motion in district court for relief from the judgment under federal rule 60(b).[6] Appellate review is ordinarily unaffected by matters not contained in the record.[7] This we think is the case with the facts disclosed here, whether characterized as "newly-discovered evidence" or "changed circumstances." In neither event do the disclosures warrant vacating our judgment.

■■■ The fact that additional documents exist, insofar as it is probative of the thoroughness *vel non* of the search, is rather plainly "newly discovered evidence." We have found no case in which the Supreme Court or a court of appeals has granted a rehearing or vacated its opinion based on newly discovered evidence. The reason for this should be self-evident: an appellate opinion is based on the record before it, and hence cannot be set aside on the basis of newly discovered facts outside the record.[8] This rule is clear in the Supreme Court's cases, dating from those in the last centu-

---

4. Maj. opin. at —— of 197 U.S.App.D.C., at 352 of 607 F.2d.

5. *See Carr v. District of Columbia*, 177 U.S.App.D.C. 432, 439, 543 F.2d 917, 924 (1976).

6. Fed.R.Civ.P. 60(b).

7. There are a number of settled exceptions to this general principle of appellate review; as, for example, where there is an intervening change in a pertinent law, *e. g., Gomez v. Wilson*, 155 U.S.App.D.C. 242, 247–48, 477 F.2d 411, 416–17 (1973); changed circumstances which render the controversy moot, *e. g., Wirtz v. Local Union 410*, 366 F.2d 438, 442 (2d Cir. 1966); changed circumstances which alter the appropriateness of injunctive relief, *e. g.,*

*Korn v. Franchard Corp.*, 456 F.2d 1206, 1208 & n.3 (2d Cir. 1972); *In re Gulf Aerospace Corp.*, 449 F.2d 733, 734 (5th Cir. 1971); and, in limited cases, facts which may be judicially noticed, *e. g., Landy v. Federal Deposit Insurance Corp.*, 486 F.2d 139, 150–51 (3d Cir. 1973), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).

8. *See, e. g., Carr v. District of Columbia*, 177 U.S.App.D.C. 432, 436, 543 F.2d 917, 921 (1976); *AG Pro, Inc. v. Sakraida*, 481 F.2d 668, 669 (5th Cir. 1973), *rev'd on other grounds*, 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976); *Davis v. Casey*, 70 App.D.C. 27, 34–35, 103 F.2d 529, 536–37 (1939).

ry [9] to the recent *Standard Oil* case [10] where the Court refused to recall its mandate and vacate its opinion on the basis of newly discovered facts, stating that its opinion was confined to the record.

An appellate court has no fact-finding function. It cannot receive new evidence from the parties, determine where the truth actually lies, and base its decision on that determination. Factfinding and the creation of a record are the functions of the district court; therefore, the consideration of newly-discovered evidence is a matter for the district court. The proper procedure for dealing with newly discovered evidence is for the party to move for relief from the judgment in the district court under rule 60(b) of the Federal Rules of Civil Procedure.

Insofar as plaintiffs rely on the facts surrounding the documents' discovery and release by the CIA, their argument is more nearly dependent on "changed circumstances." To be sure, there are occasional cases in which altered circumstances are properly noticed on appeal.[11] Invariably in such cases, however, events have altered the essential nature of the controversy, as, for example, where there has been an intervening change in the law or where the controversy has become moot. But in this case the distinction between new evidence and altered circumstances is largely a matter of technical usage rather than substance.[12] Here the intervening events are allegedly probative of the same contentions as arose from the mere existence of the documents (*i. e.*, that the search was not conducted thoroughly or in good faith). Consequently, for purposes of appellate review of these allegations, we think nothing turns on the arguable distinction between newly discovered evidence and altered circumstances. Under either theory the proper course ordinarily would be to proceed in the first instance in district court under rule 60(b).

Finally, inasmuch as relief in district court may be foreclosed,[13] it might be thought that this court, in the exercise of our appellate jurisdiction, should remand for further proceedings in light of the new facts without regard to the strictures of rule 60(b). Some support may be found for the proposition in the broad language of 28 U.S.C. § 2106, which provides:

> The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.[14]

This court recently reserved the question whether section 2106 afforded an alternate way of reopening a final judgment in light of new facts.[15] Although our research has

---

**9.** *E. g., Maxwell Land-Grant Case*, 122 U.S. 365, 7 S.Ct. 1271, 30 L.Ed. 1211 (1887); *Roemer v. Simon*, 91 U.S. 149, 23 L.Ed. 267 (1875).

**10.** *Standard Oil Co. v. United States*, 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976).

**11.** *See* note 7 *supra.*

**12.** The distinction is ordinarily made between these two grounds of relief for purposes of applying the timing rules for filing motions under Fed.R.Civ.P. 60(b). To be "newly discovered," evidence must have been in existence at the time of the trial, *see* C. Wright & A. Miller, Federal Practice and Procedure § 2859 & n.35 (cases cited) (1973). However, in this case, the alleged substantive effect of the disclosures is independent of their characteriza-

tion for purposes of rule 60(b). Moreover, the exercise of our discretion is likewise unconfined by the "correct" rule 60(b) characterization of these facts.

**13.** See pp. —— — —— of 197 U.S.App.D.C., 372–373 of 607 F.2d *infra.*

**14.** 28 U.S.C. § 2106 (1976).

**15.** *Carr v. District of Columbia*, 177 U.S.App. D.C. 432, 444 & n.96, 543 F.2d 917, 929 & n.96 (1976) (if it appeared relief were not otherwise available, court would consider "whether the interests of justice would not require [it] to remand to the District Court to consider the claim").

disclosed no case which has so held, we may suppose *arguendo* that we do have ample revisory power under section 2106 *in appropriate cases.* We are nevertheless thoroughly convinced that this would not be a proper occasion for such extraordinary relief. Nothing in the circumstances which plaintiffs raise suggests to us that the district court judgment was incorrect. We are satisfied by the submissions to this court that the original failure to uncover the documents was wholly understandable and not inconsistent with the district court's finding that the search was thorough.

Moreover, although the delay in releasing the materials may not be excused, we do not think that that misconduct vitiates the district court's finding either. Only were we to indulge a fairly harsh inference as to the *bona fides* of the CIA would we be inclined to upset the judgment. The instant facts fall quite short of supporting any such conclusion. Consequently, whether or not there is any possibility of relief from the judgment in district court, we decline to disturb our affirmance respecting the thoroughness of the search. We reach this conclusion fully aware that we deal here with a summary judgment whose factual basis derives from affidavits and without discovery.

### 3. Relief in the District Court

Relief from a final judgment may be sought in district court through a rule 60(b) motion; [16] our decision not to vacate our affirmance is, of course, without prejudice to plaintiffs' proceeding under that rule. However, as we have noted, that approach may be difficult or wholly unavailable.

Insofar as the additional documents are new evidence, recourse to rule 60(b) is governed (and apparently precluded) by the rule's strict timing requirements. There is an ironclad one-year limit on the filing of a rule 60(b) motion based on newly discovered evidence. Such motions must be filed within one year from the date the judgment was entered in the district court, which in this case was 26 May 1976—two years ago and more. The one-year period is not tolled by a pending appeal,[17] and under the federal rules no court has power to extend the deadline.

The one-year time limit in rule 60(b) applies only to motions under clauses (1), (2), and (3), covering fraud between the parties, newly discovered facts, and misconduct of a party. There is also a catch-all clause (6), covering "any *other* reason justifying relief from the operation of the judgment." There is no time limit for motions brought under this clause; however, relief under this clause is not available unless the other

16. Fed.R.Civ.P. 60(b) provides as follows:

(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc. On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one

year after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as provided in Title 28, U.S.C., § 1655, or to set aside a judgment for fraud upon the court. Writs of coram nobis, coram vobis, audita querela, and bills of review and bills in the nature of a bill of review, are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action.

17. *Greater Boston Television Corp. v. FCC,* 149 U.S.App.D.C. 322, 334, 463 F.2d 268, 280 (1971), *cert. denied,* 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972); C. Wright & A. Miller, Federal Practice and Procedure § 2866, at 233 (1973).

clauses, (1) through (5), are inapplicable.[18] It may be that a showing of changed circumstances would bring plaintiffs within the residual 60(b)(6), although it is far from certain either that the allegations are not covered by clauses (1) through (3) (in which case they would be time barred) or that they present the "extraordinary" circumstances for which relief under 60(b)(6) is reserved.[19]

■■■■ In any case, rule 60(b) contains a saving clause which states that the rule "does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order or proceeding . . . ." Thus the rule does not extinguish the historical authority of equity courts to reform judgments in appropriate cases.[20] The one-year limit on certain of the rule 60(b) motions is not applicable to the independent action, leaving it, apart from collateral attack, as the only manner of obtaining relief from a judgment in those cases where the 60(b) motion has become time barred. We recently recalled that " 'the exception for equitable interposition by independent suit rests on "stringent" rules limited to circumstances "which render it manifestly unconscionable that a judgment be given effect".' "[21] Although such circumstances may sometimes appear from evidence disclosed after the judgment, such extraordinary review is not to be indulged loosely. We have observed:

> in an independent action seeking relief from a judgment on the basis of newly-discovered evidence and asking for a new

trial the plaintiff must meet the same substantive requirements as govern a motion for like relief under Rule 60(b): he must show that the evidence was not and could not by due diligence have been discovered in time to produce it at trial; that it would not be merely cumulative; and that it would probably lead to a judgment in his favor.[22]

We merely note the difficulty of satisfying the "stringent" rules which circumscribe the trial court's discretion in such matters; our disposition does not, of course, foreclose plaintiffs' bringing an independent suit for relief.

B. *The Hearing Transcript, the Hillenkoetter Statement, and the Definition of "Agency Records" Issues*

With respect to the congressional hearing transcript issue, we held in our 23 May decision that, given the circumstances of the transcript's creation, it "remains under the control of and continues to be the property of the House of Representatives."[23] Thus, we concluded that "the Hearing Transcript is not an 'agency record' but a Congressional document to which the FOIA does not apply."[24]

With respect to the Hillenkoetter Statement issue, we held that the deleted portions of the Statement could properly be withheld pursuant to FOIA Exemption 3, which was determined to encompass 50 U.S.C. § 403(d)(3) and 50 U.S.C. § 403g. Our analysis involved a two-step inquiry: (1) whether the CIA's nondisclosure stat-

---

**18.** *Klapprott v. United States*, 335 U.S. 601, 613, 69 S.Ct. 384, 93 L.Ed. 266 (1949); C. Wright & A. Miller, Federal Practice and Procedure § 2864, at 217 (1973).

**19.** *See, e. g., Ackermann v. United States*, 340 U.S. 193, 202, 71 S.Ct. 209, 95 L.Ed. 207 (1950); C. Wright & A. Miller, Federal Practice and Procedure § 2864 at 219–20 (1973).

**20.** *See* Advisory Committee Note to 1946 Amendment to Rule 60(b); *West Virginia Oil & Gas Co. v. George E. Breece Lumber Co.*, 213 F.2d 702, 706 (5th Cir. 1954). The independent action is, of course, to be distinguished from the ancillary common law and equitable remedies specifically abolished by rule 60(b).

**21.** *Carr v. District of Columbia*, 177 U.S.App. D.C. 432, 442, 543 F.2d 917, 927 (1976) (quoting *Greater Boston Television Corp. v. FCC*, 149 U.S.App.D.C. 322, 333, 463 F.2d 268, 279 (1971), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972)).

**22.** *Philippine Nat'l Bank v. Kennedy*, 111 U.S. App.D.C. 199, 200, 295 F.2d 544, 545 (1961) (footnotes omitted).

**23.** Maj. opin. at —— of 197 U.S.App.D.C., at 347 of 607 F.2d.

**24.** Maj. Opin. at —— of 197 U.S.App.D.C., at 348 of 607 F.2d.

utes—sections 403(d)(3) and 403g—are Exemption 3 statutes; and (2) whether the withheld materials, as described by CIA's affidavit, fall within the nondisclosure statutes.

Finally, we refrained from reaching the definition of "agency records" issue because no live and genuine controversy remained on this matter between plaintiffs and CIA.

■ Neither the discovery of additional documents, nor CIA's delayed disclosure of this discovery, nor CIA's ultimate release of the documents in any way undermines our holdings on these three issues. The discovery and release of new documents obviously does not change the character of the Congressional Hearing Transcript. It remains a congressional record for the reasons stated in our opinion, and as such was properly withheld by CIA. Similarly, the discovery and release of additional documents clearly has no bearing on whether, as a matter of law, sections 403(d)(3) and 403g are Exemption 3 statutes or on whether portions of the Statement fall within those nondisclosure statutes. Finally, the circumstances of the discovery and release of new documents do not give rise to a controversy between the parties as to CIA's definition of "agency records."

Nevertheless, plaintiffs argue that the CIA's discovery of additional documents does, in a very remote sense, bear upon the validity of our holdings on the Transcript, Statement, and Definition issues. They point out that our conclusions on these three issues were, to varying extents, based partially upon assertions in CIA's affidavits. Thus, they argue that, since the discovery of new documents suggests that CIA's affidavits may have been inaccurate in one respect, namely, the thoroughness of search issue, they may also have been inaccurate in other respects, namely on these other three issues. Therefore, plaintiffs argue, our decision on these points may have rested on incorrect affidavits. In other words, plaintiffs' contention is that the

CIA's discovery of new documents is circumstantial evidence that the Agency's affidavits generally may not have been accurate.

Our reasoning with respect to the issue of the search's thoroughness is fully applicable here.[25] We will not vacate our judgment on the basis of such a tenuous theory. The allegations raise no serious doubt as to the correctness of the district court's findings. Plaintiffs may nevertheless wish to seek relief from the district court under rule 60(b) or otherwise. In the meanwhile, our resolution of the Transcript, Statement, and Definition issues must stand as originally stated in our 23 May decision.

## C. *Attorneys' Fees Issue*

■ In our 23 May decision we declined to award attorney's fees to plaintiffs, holding that plaintiffs had not "substantially prevailed" even though the CIA had released the Vandenberg Statement and portions of the Hillenkoetter Statement *after* they commenced suit. We stated: "Even if plaintiffs could show some causal nexus between their litigation and the CIA's disclosure, which they have not done, we doubt that plaintiffs could be said to have 'substantially prevailed' if they, like Pyrrhus, have won a battle but lost the war."[26]

Plaintiffs now contend that this aspect of our decision has been undermined by subsequent events. They point *not* to the CIA's discovery of additional documents or to the Agency's delay in revealing this discovery, but rather to the fact that CIA ultimately released these additional documents. Plaintiffs' argument seems to be that there is the requisite causal connection between their prosecution of the action and CIA's ultimate release of further documents such as they may *now* be said to have "substantially prevailed" in the litigation. The Agency's release of documents occurred *after* the decision in this case. Thus, this part of plaintiffs' argument relies on a *post-judgment change in factual circumstances.*

---

25. *See* pp. ———— of 197 U.S.App.D.C., pp. 369–374 of 607 F.2d *supra.*

26. Maj. opin. at —— of 197 U.S.App.D.C., at 356 of 607 F.2d. *See* 5 U.S.C. § 552a(4)(E) (1976).

Of course, plaintiffs might move to re-open this particular issue in district court by means of a rule 60(b)(6) motion. The one-year limit in rule 60(b) applies only to clauses (1) through (3); it does not apply to clause (6) which authorizes relief from judgment for "any other reason justifying relief *from the operation of the judgment.*" As we have observed, one of the grounds for relief that has been recognized under this broad rubric is post-judgment change in circumstances.[27]

However, in the interest of expediting this matter and because we entertain little doubt that the merits of the attorneys' fees argument should be reheard in light of the new facts, we vacate that portion of our affirmance and the District Court judgment pertaining to fees and remand for the District Court's reconsideration.

*So ordered.*

BAZELON, Circuit Judge, dissenting from the denial of the motion to vacate, the denial of rehearing, and the denial of rehearing en banc.

In November or December, 1977, while this case was pending before our panel, the General Counsel of the CIA learned that documents known to be relevant to plaintiffs' FOIA request had been discovered within the agency. Not until May 30, 1978, one week after our opinion issued, and some six months after the documents were "discovered," did the General Counsel inform the Justice Department that these documents had been found.[1] We must now determine the effect of these events on our previous disposition of this case. I believe that both the disclosure of 321 additional documents and the circumstances surrounding their discovery cast serious doubt on the original disposition of this case. I therefore dissent from the majority's decision to leave that opinion undisturbed.[2] I concur, however, in the decision to remand for consideration of plaintiffs' right to attorney fees.

I.

I begin my examination with a simple question—had the CIA seasonably revealed to us, *prior to our decision,* that it had "discovered" 321 documents arguably within the scope of plaintiffs' request, would we nonetheless have issued the opinion of May 23? I have no difficulty in concluding that we would not.[3]

---

27. *See Scott v. Young,* 307 F.Supp. 1005, 1007 (E.D.Va.1969), *aff'd,* 421 F.2d 143 (4th Cir.), *cert. denied,* 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970); *American Employers Ins. Co. v. Sybil Realty,* 270 F.Supp. 566, 569–70 (E.D.La.1967).

1. The Justice Department, acting with commendable dispatch, appears to have informed both plaintiffs *and this court* of the existence of additional documents on the same day that the CIA informed Justice. There is thus no suggestion that the attorneys for the Justice Department departed in any way from their duties as officers of this court.

2. I express no opinion herein concerning the significance of these disclosures on the "hearing transcript," the "Hillenkoetter statement" and the definition of agency records. I adhere to the views expressed in my dissenting opinion. *See Goland v. CIA,* 197 U.S.App.D.C. ——, 607 F.2d 339 (D.C.Cir. 1978) (Bazelon, J., dissenting) at ——,—— —— of 197 U.S.App.D.C., at 358–362 of 607 F.2d (hearing transcript), —— —— —— of 197 U.S.App.D.C., 362–365 of 607 F.2d (Hillenkoetter statement).

For the purposes of this discussion I confine my remarks to the impact of these disclosures on the majority's previous discussion of the adequacy of the CIA's search.

3. We may assume, arguendo that an appellate court would be more reluctant to consider new evidence brought to its attention after its opinion issued rather than before. *Compare Standard Oil Co. of California v. United States,* 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976) (denying motion to recall mandate after decision on the basis of alleged misconduct by government counsel and new evidence) *with United States v. Shotwell (I),* 355 U.S. 233, 241, 78 S.Ct. 245, 251, 2 L.Ed.2d 234 (1957) (remanding for consideration of a "challenge to the integrity of the record based on newly discovered evidence"). But where, as here, the evidence was withheld by the agency with full knowledge of its relevance, the concern for finality is overridden by a need to prevent the agency from profitting by its misdeed. Therefore, I believe it is appropriate to analyze the motion to vacate in terms of the effect that the CIA's revelations would have had on this court, had that information been seasonably tendered before our decision.

Accordingly, this case comes in a different posture than *Realty Acceptance Corp. v. Mont-*

The jurisdiction of the federal courts is limited to cases or controversies.[4] Central to that provision is the requirement that the federal courts do not sit to give advisory opinions,[5] nor to render decisions which can offer no relief to any party.[6] Here the plaintiffs sought all CIA records concerning the legislative history of the agency's governing statute. As a result of the belated release of some 321 documents to plaintiffs by the CIA, it may well be that plaintiffs are fully satisfied that their request has been honored[7] and no longer require further relief from this court on that issue.

If the plaintiffs are in fact satisfied, then any appeal from the denial of discovery is clearly moot. Because mootness would deprive this court of jurisdiction, we would be obliged to note it, regardless of when during the course of the litigation the controversy became moot.[8] I therefore find it difficult to believe that we would not have inquired further into the issue of mootness, either by remanding to the district court for a determination of that issue,[9] or at least requiring further submission from the parties.

## II.

Even assuming that there remained a live controversy between the parties over the existence of additional documents, it is inconceivable to me that we would have been indifferent to the significance of the CIA's admissions in assessing the adequacy of the original search. The majority rests its decision on the observation that "the mere fact that additional documents have been discovered does not impugn the accuracy of the Wilson affidavits." Maj. op. at —— of 197 U.S.App.D.C., at 369 of 607 F.2d. To my mind, this is a question of fact that cannot possibly be decided on the record before us. The majority notes, "[a]ccording to CIA, the discovery of these documents was entirely adventitious. They were found . . . only after extraordinary effort . . . ." *Id.* at —— of 197 U.S.App.D.C., at 370 of 607 F.2d. These representations may well be true. But the fact is that at this stage of the litigation they are simply *ex parte* representations. Plaintiffs have had no opportunity to test these assertions under circumstances that would admit of appropriate findings of fact.

The majority's extreme reluctance to permit plaintiffs to explore the factual basis of the CIA's assertions thus repeats the basic error of the original panel opinion. The majority again prematurely forecloses plaintiffs' inquiry into the nature of the CIA's search in response to the FOIA re-

---

*gomery*, 284 U.S. 547, 52 S.Ct. 215, 76 L.Ed. 476 (1932), where the Court of Appeals' order remanding to the District Court to consider new evidence was entered *after* the Court of Appeals lost jurisdiction of the case (by virtue of its earlier order dismissing the appeal). *See id.* at 551–52, 52 S.Ct. 215.

4. U.S.Const., Art. III, Sec. 2.

5. *See e. g., Golden v. Zwickler*, 394 U. S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).

6. *See, e. g., Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975). [A] federal court has neither the power to render advisory opinions nor "to decide questions that cannot affect the rights of litigants in the case before them." Its judgments must resolve " 'a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' " (Citations omitted.)

7. Of course, plaintiffs have not conceded the propriety of the CIA's decision to withhold certain documents or portions of documents pursuant to FOIA. *See* note 2, *supra*.

8. *See*, e. g. *Allee v. Medrano*, 416 U.S. 802, 818 n.12, 94 S.Ct. 2191, 2202, 40 L.Ed.2d 566 (1974): "In the federal system an appellate court determines mootness as of the time it considers the case, not as of the time it was filed." *See also Steffel v. Thompson*, 415 U.S. 452, 459–60 & n.10, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

9. "There would certainly be no doubt of the need for a court remand if the change of circumstances were such as to make the case moot." *Greater Boston Television Corp. v. F. C. C.*, 149 U.S.App.D.C. 322, 337 n.25, 463 F.2d 268, 283 n.25 (1971), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972). Although Judge Leventhal there referred to review of agency proceedings, the same jurisdictional considerations apply to appellate review of a district court decision.

quest.[10] But the error is even more serious in this case, for we do not have the benefit of a trial court judgment, entered after appropriate inquiry, that these revelations do not undermine the validity of the CIA's original affidavits. The majority correctly notes that "[a]n appellate court has no fact-finding function." Maj. op. at —— of 197 U.S.App.D.C., at 371 of 607 F.2d. I submit that the majority denies the motion to vacate precisely because it has found the facts against plaintiffs.

Both the volume of documents discovered by the CIA and the circumstances surrounding the initial withholding and later disclosure of the documents raise serious questions that can only be resolved by a full factual inquiry. The majority finds the "original failure to uncover the documents was wholly understandable." Perhaps I would too, on a proper record. Under our supervisory power, invested in this court by virtue of 28 U.S.C. § 2106 (1976), I would

remand this case to the district court to determine the effect of these disclosures on the district court's prior decision upholding the adequacy of the CIA's initial search.[11]

### III.

I wish to make explicit the seriousness with which I regard the CIA's dereliction in this case. I do not suggest that the CIA failed to inform this court that it had discovered the documents simply to procure a favorable decision (though this possibility certainly cannot be rejected without a fuller factual inquiry into the circumstances surrounding these events). I do believe firmly, however, that the CIA had a strict obligation to report this information to the court *at the moment its arguable relevance became known.*[12] This is central to the "unqualified duty of scrupulous candor that rests upon government counsel in all dealings" with the courts.[13] The CIA's "excuse" for this delay, that the matter was

---

10. As I noted in my earlier dissent, "[m]y disagreement, again, concerns not the substance but the timing of the judgment in favor of the agency." Dissenting op. at —— of 197 U.S. App.D.C., at 366 of 607 F.2d.

11. I entertain no doubt that we have the power to consider the impact of these disclosures pursuant to § 2106, whether they are characterized as "newly discovered evidence" or "changed circumstances." *See Patterson v. Alabama*, 294 U.S. 600, 607, 55 S.Ct. 575, 79 L.Ed. 1082 (1935); *Gomez v. Wilson*, 155 U.S.App.D.C. 242, 247–248, 477 F.2d 411, 416–17 (1973). Although typically this evidence should be considered through a motion for a new trial, compelling circumstances justify this court considering such developments. *Cf. Carr v. District of Columbia*, 177 U.S.App.D.C. 432, 444 & n.96, 543 F.2d 917, 929 & n.96 (1976) (where consideration of new evidence time-barred under Rule 60(b) and no other forum available to consider such evidence, court "would consider whether the interests of justice would not require" remand to district court pursuant to 28 U.S.C. § 2106).

The possibility that the CIA has disregarded its responsibilities under the Freedom of Information Act presents a particularly appropriate occasion for the exercise of our § 2106 authority to require further proceedings. Under FOIA, as with any litigation, we adhere to "the fundamental precept that issues on appeal are to be confined to those duly presented to the trial court", *Jordan v. Department of Justice*, 192

U.S.App.D.C. 144, 591 F.2d 753 (1978). However, in *Jordan* we recognized that in unusual circumstances we might remand to the trial court (pursuant to § 2106) to permit consideration of a FOIA exemption raised by the government for the first time on appeal. In so observing, we recognized that the policies of FOIA might outweigh the generalized interest in finality that normally confines our review to the issues as presented in the trial court. If the government, under some circumstances, is to be permitted to expand its arguments on appeal to protect legitimate interests in non-disclosure, surely it is equally consonant with the principles of FOIA to permit one who requests information to enlarge the record, especially where there is disturbing evidence of impropriety by the government.

12. Had the CIA mistakenly failed to recognize the relevance of these documents, or had the librarian failed to inform the General Counsel of her discovery, different, and more difficult issues would be posed. Here, however, *the three top legal officers* of the CIA withheld the fact that documents had been discovered which *they knew to be relevant to this litigation.* I can imagine no clearer breach of duty to this court.

13. *Shotwell Mfg. Co. v. United States (Shotwell II),* 371 U.S. 341, 358, 83 S.Ct. 448, 459, 9 L.Ed.2d 357 (1963).

given "insufficient priority," [14] is nothing short of a confession that it has been derelict in its duty to this court. Such behavior is worthy only of censure.[15]

---

14. The full text of the CIA's explanation is as follows:

To be sure, there is one regrettable aspect to the CIA's recent disclosures. Apparently the Agency became aware of the existence of documents possibly relevant to *Goland* in the late fall of 1977. See Exhibits C and E. Despite the pendency of this case before this Court and plaintiffs' outstanding FOIA request, the documents were not compiled speedily, and Justice Department counsel were not informed of their existence. However, this was not a "strategy decision to stand mute," as claimed in plaintiffs' motion to vacate. As explained in the attached letter from the CIA's Office of General Counsel to Justice Department counsel (Exhibit E), insufficient priority was given to these additional documents because there was uncertainty to what extent the documents found by the law librarian were relevant to this litigation and because of the press of other business. Moreover, as is clear from the attached CIA letters (Exhibits C, D, and E), the number of additional documents turned out to be very great. The law librarian did not complete her first partial inventory of the additional documents until May 19, 1978. *Id.* Opp. to Mot. to Vacate at —— of 197 U.S.App.D.C., at 369–370 of 607 F.2d.

15. The CIA seeks to refute any suggestion of bad faith by pointing to its disclosure, albeit belated, of the documents after our opinion issued. Opp. to Mot. to Vacate at —— n.3 of 197 U.S.App.D.C., at 369 n.3 of 607 F.2d. I confess I am unable to find grounds for applause in the agency's tardy recognition of long-neglected legal and moral duty.